Hon. LUKE P. POLAND, Chief Judge.
Hon. JAMES BARRETT,
Hon. LOYAL C. KELLOGG. } Assistant Judges.

---

THE VERMONT AND CANADA RAILROAD COMPANY *v.* THE VERMONT CENTRAL RAILROAD COMPANY, JOHN SMITH, WILLIAM R. LEE, JOHN S. ELDRIDGE, WILLIAM H. GREGORSON, JOHN C. PRATT, GEORGE M. DEXTER, WILLIAM APPLETON,

2

Vermont and Canada R. R. Co. *v.* Vermont Central R. R. Co. et al.

SILAS PEIRCE, WILLIAM H. SUMNER, WILLIAM SOHIER, FITZ HENRY HOMER, AND H. HOLLIS HUNNEWELL.*

*Corporations. Contract. Railroad. Forfeiture. Pledge. Lien. Interest.*

If a contract between two corporations is not in violation of some public law or contrary to public policy, *it seems* that only the immediate parties to it, as the corporations themselves, or the stockholders, who are parties by representation, hold such a legal position in relation to the contract, as to entitle them to raise the question of its validity on account of the alleged want of capacity of the parties to make it.

The contract of lease between the Vermont and Canada Railroad Company, and the Vermont Central Railroad Company, made August 24th, 1849, and the addition thereto made July 9th, 1850, were not *unlawful* in the sense of being in violation of some public law, or contrary to public policy. Those corporations themselves and their stockholders having assented to the validity of those contracts, it is not competent for a bondholder, under the first mortgage of the Vermont Central Railroad Company, which mortgage was given in express recognition of and subjection to those contracts, to object to their validity on account of the want of capacity of those corporations to make them.

Though the charters of those corporations did not authorize such contracts, the general act of 1847 (Comp. Stat. chap. 26, sec. 66,) did; and it was competent for the corporations, by the unanimous consent of their stockholders, to accept the additional powers granted by that act, and to exercise them with the same efficiency to every intent, as if they had been conferred by the original acts of incorporation. The exercise of these powers by the stockholders of those corporations, in authorizing the contract of July 9th, 1850, at a meeting held for that purpose, without any objection on the part of any one of them, either at that time or subsequently, is sufficient ground of presumption that the corporations, as such, had accepted them as part of their organic law; and that the stockholders all concurred in the action then taken, and that they assent to its effect for all legitimate purposes touching the rights, either of the corporation or of themselves individually, as members of such corporation.

The claim that the indentures of August 24th, 1849, and July 9th, 1850, are not a lease and security for rent, but a pretext and cover under which the Vermont Central Railroad Company went on and built, with its own funds and means, the Vermont and Canada Railroad, the same as if the latter company had not existed, the pretended taking of stock in that company

* This cause was argued before POLAND, Ch. J., and BARRETT and KELLOGG, J. J. The other judges having been of counsel in the case did not sit at the hearing.

Vermont and Canada R. R. Co. *v.* Vermont Central R. R. Co. et al.

being in fact a loan of money by the stockholders to the Vermont Central Railroad Company at a guaranteed interest of eight per cent.,—this claim, on the part of the defendant Sohier, discussed and held unfounded.

The Legislature of Vermont, by the acts of November 18th and November 25th, 1858, (acts of 1858, pp. 182 and 185,) in regard to the time of completion of the Vermont and Canada Railroad, and the mode of the operation of that road, in case the charter of that company should become forfeited, did not undertake to *declare a forfeiture*, but only to prescribe the consequences to flow from certain future acts and omissions on the part of that company. The question, therefore, whether a forfeiture of the charter of that company has occurred, can only be determined in a proper judicial proceeding brought in behalf of the public, for the purpose of testing that question.

In the present posture of the case, the time for the completion of the Vermont and Canada Railroad, as fixed by the legislature in 1859, not having expired; *held*, that there has not been such a failure on the part of the orators to perform the undertakings on their part in the instruments of lease, or the requirements of their charter and the amendments thereto, as will discharge the Vermont Central Railroad Company, or the trustees or bondholders under the first mortgage of that road, from the obligation to pay rent for such portion of the Vermont and Canada Railroad as has been completed, and proffered for acceptance, or from their subjection to the pledge of the tolls, etc., of both roads, as security for such rent.

*Held*, therefore, that the indenture of August 24th, 1849, is a valid instrument between the parties, and that of July 9th, 1850, is valid in constituting a pledge and lien, by way of security for the payment of the stipulated rent, upon the tolls, fares and incomes of the two roads, in priority to the trustees and bondholders, and that the same is enforceable for the rents in arrear of the Vermont and Canada Railroad, as already constructed and used.

*Held*, that though as an open question, independently of the action of the parties, it would seem that the contract of lease contemplated that the sum on which the eight per cent. should be cast, to arrive at the amount of rent to be paid by the Vermont Central Railroad Company, was to be the actual outlay of money directly for the construction of the Vermont and Canada Railroad; still the meaning put upon the contract by the parties themselves by the payment of rent and the adjustment of accounts, appears so clearly to have been that the cost of construction should be measured by the capital stock of the Vermont and Canada Company paid in, with interest on the expenditures from the time they were made in pursuance of the contract of lease, that such must be taken to be the true meaning of the contract in that respect.

It is not enough, in order for the bondholders to avoid the effect of the contract, as understood and acted upon by the two companies in this respect, to show that as between themselves and the Vermont Central Railroad Company it would be prejudicial and unjust to them to give the contract that effect; but they must also show that it would be inequitable on the part of the Vermont

and Canada Company as against them, to have such effect given to it. This they have failed to show.

If a contract is silent on the subject of interest, and does not by implication exclude it, on money due and payable under the contract the law implies that interest is to be paid from the time the debt becomes payable.

The compromise agreement of April, 1857, between the two corporations, that the sum of thirty-two thousand six hundred and seventy-two dollars and fifteen cents should be added to the cost of construction of the Vermont and Canada Railroad, though possibly effective as a settlement between the parties themselves, is not binding upon the trustees and bondholders, they having previous to that time supplanted the Vermont Central Company in the immediate interest to be affected by the allowance of that claim; and, the masters having failed to find that that sum was a part of the costs of construction, the same is disallowed.

The orators' claim for incidental expenses disallowed.

The sum on which, as cost of construction, the eight per cent. is to be computed as the measure of the rent due the orators, fixed at one million three hundred and forty-eight thousand five hundred dollars.

APPEAL from the decree of the court of chancery.

The bill was brought in April, 1855, and set forth that the orators were incorporated by an act of the legislature of this State, approved October 31st, 1845, (see acts of 1845, No. 25 p. 65) and that the Vermont Central Railroad Company was incorporated by the same legislature by an act approved October 31,1843. (See acts of 1843, No. 53 p. 43.)

That certain articles of agreement were duly entered into by those corporations on the 24th of August, 1849, the 11th of January, 1850, and the 9th of July, 1850, respectively, in the following words, viz:

*Agreement of August 29th,* 1849.

" These articles of agreement, made this twenty-fourth day of August, in the year eighteen hundred and forty-nine, by and between the Vermont Central Railroad Company of the first part, and the Vermont and Canada Railroad Company of the second part, both being corporations established by the authority of the State of Vermont,            *Witnesseth :*

That whereas it is agreed by and between the parties hereto, that the Vermont and Canada Railroad Company shall proceed

(with all dispatch consistent with the amount of labor to be done,) to construct and finish the Vermont and Canada railroad, and that the same shall be leased to, and run by, the Vermont Central Railroad Company;

Now, Therefore, the Vermont and Canada Railroad Company hereby agree with the Vermont Central Railroad Company to provide forthwith the necessary funds, and to proceed to construct the said Vermont and Canada railroad, its fixtures and buildings; to settle and pay all land and other damages, and to do and complete all other arrangements and things, in a proper and legal manner, so that their right and title to said road, and to the use of it, shall be clear and unquestionable. It being understood and agreed that the several sections and portions of said Vermont and Canada railroad shall be constructed at such limitation of cost within such time, on such location, and in such way and manner in all respects, as shall be conformable to their charter, and as shall be satisfactory to, and approved by, the directors of the Vermont Central Railroad Company, or any agent whom said directors will appoint for that purpose.

And the Vermont and Canada Railroad Company, in consideration of the premises and of the covenants of said Vermont Central Railroad Company, hereinafter contained, agree to grant lease and demise, and so far as they have present legal authority do hereby grant, lease and demise unto the Vermont Central Railroad Company, their successors and assigns, the whole of said Vermont and Canada railroad as the same is now located or shall be hereafter located and constructed, together with all the lands, depots, buildings, tracks, fixtures, property, rights and privileges thereto appertaining or belonging, or which may hereafter be procured or purchased by, or be granted, appertain, or belong to the said road with the full right and privilege of using the said road, depots, and other property and rights, with cars, engines and other motive power, or to permit, or authorize others so to use the same, in any way which the Vermont Central Railroad Company, their successors or assigns, may from time to time elect; and as fully and freely as the Vermont and Canada Railroad Company might or could do under their charter, and any additions made, or to be made thereto.

To HAVE AND TO HOLD the said Vermont and Canada railroad as the same is now located, or shall hereafter be located or constructed, and all lands, depots and other property, rights and privileges, whether now acquired or hereafter to be procured, unto the said Vermont Central Railroad Company, their successors and assigns forever, as fully and freely to all intents and purposes, as the Vermont and Canada Railroad Company might or could have, enjoy, and use the same under their charter, and any additions made, or to be made thereto :—Subject, however, (in case this instrument shall be held to be a present lease,) to the right of the Vermont and Canada Railroad Company, their officers, agents and workmen, to enter upon said road for the purpose of constructing the same, and completing the arrangements herein covenanted, on their part, to be made ; this right to cease as soon as said road shall be accepted by the Vermont Central Railroad Company, as completed :—Subject also to the right of the legislature of the state of Vermont, after the expiration of FIFTY years from the opening of the road for use, to purchase the same, as provided in the sixteenth section of the charter of said company :—and, subject, lastly, to the legal rights, if any, of all other railroad companies to use the same.

And to enable the Vermont Central Railroad Company beneficially to enjoy and improve the said property, rights and privileges, the said Vermont and Canada Railroad Company hereby nominate, constitute and appoint, the Vermont Central Railroad Company, their successors and assigns, their attorneys, irrevocable, with full power and authority to use the name of the Vermont and Canada Railroad Company, in and about the future repair, management and use of the said Vermont and Canada railroad, and all the property, rights and privileges which may at any time appertain thereto, with the right and power, so far as the same may lawfully be done, to connect said road with other railroads ; to make branch or side tracks, and to make such alterations in the leased and granted premises, as the convenient use thereof shall be found to require, and as may lawfully be done ; also with the right and power to establish, receive and collect tolls, fares, rates of compensation, and rents for the use of said road, and other property, or for the transportation of

persons, merchandise, mails, and every description of property upon and over said road or any part thereof, for the sole use and benefit of the Vermont Central Railroad Company, their successors and assigns ; and to make any contracts, covenants, or agreements proper and necessary for all the purposes herein provided for, with any persons or corporations whatever, in the name of the Vermont and Canada Railroad Company, and under their corporate seal or otherwise.    And generally to do all other acts and things in the premises which the Vermont and Canada Railroad Company might lawfully do ; with full authority also. to use the name of the Vermont and Canada Railroad Company in and about all proceedings at law, or in equity, which the Vermont Central Railroad Company may judge necessary or expedient, in and about all the business and proceedings aforesaid, or for the purpose of fully securing to the Vermont Central Railroad Company, their successors and assigns, the quiet and beneficial enjoyment, possession and use of said road, and of all the property, rights and privileges hereby granted, secured and demised, or for any other purpose consistent with the true intent and meaning of this indenture ; and with the right for all the purposes aforesaid, from time to time, to substitute and appoint, one or more attorneys under the Vermont Central Railroad Company, and their powers at pleasure to revoke.

And the Vermont and Canada Railroad Company hereby agree with the Vermont Central Railroad Company, their successors and assigns, at all times to continue and preserve the legal organization of the Vermont and Canada Railroad Company, and at all times to hold such meetings, pass such votes, appoint all such officers and confer upon them all such powers, keep such records of their proceedings, make such reports to the legislature or otherwise, as may be required by law, and do all such other acts as may be necessary and proper to carry into full effect all the objects and provisions of this indenture ; and that they will, on reasonable demand, at any and all times hereafter, give such other assurances as may be necessary or proper therefor.

And the said Vermont and Canada Railroad Company agree, that if the Vermont Central Railroad Company shall at any time after TWENTY years from the opening of said Vermont and

Canada railroad for use, elect to purchase the demised premises, and shall have the legal right to make such purchase, then the ·Vermont and Canada Railroad Company will give to the Vermont Central Railroad Company, their successors or assigns, an absolute grant, assignment and release, in perpetuity, of the said road, and of all the other property, rights, privileges and franchises of said Vermont and Canada Railroad Company, by a deed or other instrument proper and legal therefor, running to the Vermont Central Railroad Company, or such party as they shall designate :—upon payment by the Vermont Central Railroad Company to the Vermont and Canada Railroad Company, of an amount sufficient to pay to each stockholder in the Vermont and Canada Railroad Company the par value of his shares : and will cause the said shares to be transferred to such persons or corporation as the Vermont Central Railroad Company shall designate.

And the Vermont and Canada Railroad Company agree that they will at no time interfere or act, in the use and management of their road or any of its appurtenances, except in the manner herein mentioned, or unless they shall be required so to do by law, or by the written request of the Vermont Central Railroad Company.

And the Vermont and ·Canada Railroad Company hereby farther agree that, when their road shall be completed, and the titles to the same, and to the lands, fixtures, and other property thereof, shall be vested in them, they will, on request, execute and deliver to the Vermont Central Railroad Company, their successors or assigns, a deed of confirmation, reassuring the provisions of this instrument upon the terms and conditions thereof, so far as the same may be then applicable.

And the said Vermont Central Railroad Company on their part agree, that when said Vermont and Canada railroad and its appurtenances shall be constructed in manner aforesaid, and ready for use, they will provide the necessary power and other equipment, and will open and run the same at all suitable times hereafter for the accommodation of the public, and will pay as a rent therefor, in addition to the necessary incidental expenses of said Vermont and Canada Railroad Company, a sum equal to eight per cent annually upon the amount of the whole cost, for the

time being, of said road, its buildings, fixtures, lands and appurtenances, as the same shall have been paid by the Vermont and Canada Railroad Company;—the said rent to begin on the first day of December next, and to be thereafter paid semi-annually on the first days of June and December, in each year, until said road shall be purchased by the legistature of Vermont, or by the Vermont Central Railroad Company, as before mentioned."

### Agreement of January 11th, 1850.

" The parties in the foregoing articles of agreement hereby mutually agree, that the same shall be and hereby are amended by substituting 'FIFTY' years for 'TWENTY' years, as the period after which the Vermont Central Railroad Company may, on the terms expressed in said articles, require an absolute grant, assignment, and release in perpetuity of the property, rights, privileges and franchises of the Vermont and Canada Railroad Company : it being understood that said articles are to be of the same force and effect in all respects, as if said word ' FIFTY ' had been there originally written instead of 'TWENTY.' "

### Agreement of July 9th, 1850.

" WHEREAS, it has been suggested that if from any unforeseen causes, the said Vermont Central Railroad Company should fail to pay the said rent, reserved by the preceding articles, there might occur some embarrassment or interruption in the working of the said Vermont ( entral and Vermont and Canada railroads, as one continuous line of railroad, whereby the interests and accommodation of the public would be prejudiced and the business and affairs of both the said companies suffer injury—and—

WHEREAS, for the prevention thereof as well as to afford to the Vermont and Canada Railroad Company reasonable security in the premises, it has been deemed fit to make an addition to the foregoing articles.

Now, the parties, thereto, have further agreed, respecting the leasing and running of the aforesaid road in manner following :—

*First*,—If at any time or times before the said Vermont and Canada railroad shall be purchased as mentioned, or provided for by the aforesaid articles, the rent therein reserved should be, and remain in arrear, and unpaid for the space of four months

after the same shall be payable, it shall be lawful for the said Vermont and Canada Railroad Company, to enter, or take possession of, and use, and run, not only the said Vermont and Canada railroad, but also the said Vermont Central railroad, together with all lands, depots, and other property, rights and privileges then owned and enjoyed by each of the aforesaid companies, and used in connection with, or for the purpose of running or working each of the said railroads ; and, having thus entered, it shall be lawful for the said Vermont and Canada Railroad Company, to receive all tolls, fares, and other lawful income receivable for the use of said railroads, and after paying therefrom all reasonable expenses of running and working the said railroads and of making all such repairs of each of the said railroads, or any buildings or structures connected therewith or used therefor, and also the cost of all such engines, cars, and other furniture as may be found necessary during the time or times such roads shall be so worked and run, as last aforesaid—the said Vermont and Canada Railroad Company shall apply the residue of its said receipts in, and towards the payment of all rent then in arrear and unpaid, whether the same became payable before, or during the time while so in possession as last aforesaid :—and when, and as soon as the same shall be paid in full, by means of the net receipts aforesaid, or by the Vermont Central Railroad Company, then notice thereof shall be given by the said Vermont and Canada Railroad Company, to the said Vermont Central Railroad Company, and thereupon, or without such notice, the last named company shall have the right and it shall be its duty to resume possession, and control of both said railroads in the same manner, and with the same rights and subject to the same duties as before such entry by the said Vermont and Canada Railroad Company.

*Second,*—It shall be the duty of the Vermont and Canada Railroad Company, while so in possession as aforesaid, to keep full, just and true accounts of all receipts and expenditures, and the same at all reasonable times to exhibit and render, on request to the said Vermont Central Railroad Company, and generally while working and running the said Vermont Central railroad, to discharge, as well to the public as to individuals, all duties by

Vermont and Canada R. R. Co *v.* Vermont Central R. R. Co. et al.

law incumbent on one railroad company, which, pursuant to the laws of Vermont, has made an arrangement with another rail-road company, to work or run its road, the expenses whereof to be deducted from the receipts aforesaid.

*Third,*—For the purpose of carrying this arrangement into full effect, the said Vermont Central Railroad Company, in consideration of the premises in the foregoing and these articles contained, and of one dollar to the said Vermont Central Railroad Company by the Vermont and Canada Railroad Company paid, the receipt whereof is hereby acknowledged, does hereby grant, bargain, sell and convey unto the said Vermont and Canada Railroad Company, its successors or assigns forever, the said Vermont Central railroad, as now constructed and built, and all its lands, depots and easements, property, rights and privileges, which the said Vermont Central Railroad Company, may or can, by any way, or means, lawfully sell and convey.

To HAVE AND TO HOLD the same to the said Vermont and Canada Railroad Company, its successors or assigns, to and for its own use.

PROVIDED, NEVERTHELESS, and these presents are upon the express condition that if the said Vermont Central Railroad Company, shall well and truly pay or cause to be paid, the rent reserved and made payable to the said Vermont and Canada Railroad Company, by the foregoing articles, when and as the same is therein made payable, so that there shall be no default therein, then the above conveyance by the Vermont Central Railroad Company shall be void ; and provided further, that until some default shall be made by the Vermont Central Railroad Company, in the payment of the rent reserved as aforesaid, it shall be lawful for the Vermont Central Railroad Company to retain possession of all the property hereby conveyed ; and provided further, that if any one or more defaults should be made by the Vermont Central Railroad Company in the payment of said rent reserved as aforesaid, so that the Vermont and Canada Railroad Company should go into possession under this instrument, it shall nevertheless be lawful for the said Vermont Central Railroad Company to resume possession, at the times and in the manner hereinbefore provided ; and such possession may continue until some other

12      FRANKLIN COUNTY,

Vermont and Canada R. R. Co. *v.* Vermont Central R. R. Co. et al.

and further default, by non-payment of the said rent shall be made.

And the said Vermont Central Railroad Company does hereby constitute and appoint the Vermont and Canada Railroad Company, (or at its election, the president of the Vermont and Canada Railroad Company, for the time being,) their true, sufficient and lawful attorney, in the name of the Vermont Central Railroad Company, and otherwise, as the case may require, to do any, and all acts, matters and things necessary to carry into full effect, the true intent and meaning of the foregoing articles and conveyances.

To remove all doubt, as to the meaning of the parties to the foregoing articles, it is hereby declared that, the rent to be paid under the foregoing articles, is EIGHT PER CENT per annum, on all sums expended, from time to time, by the Vermont and Canada Railroad Company, for the cost of their said road, which per centum is to be reckoned upon such sum from the time when the same shall be paid.

It is hereby further mutually agreed, that when the Vermont and Canada Railroad Company, shall have finished their said road, agreeably to the provisions of the foregoing articles of agreement, then the Vermont and Canada Railroad Company shall have no further right to expend money on said road, but the Vermont Central Railroad Company shall have the right to expend such amount of money, in improving and perfecting said road, buildings and other fixtures, as they may find necessary or convenient, for the more perfect enjoyment of said road, all to be at the expense of the Vermont Central Railroad Company, and not to be charged to the Vermont and Canada Railroad Company; and that there may be no unnecessary delay in the acceptance of the said Vermont and Canada railroad, by the said Vermont Central Railroad Company, it is further agreed, that, in accordance with the intentions of the parties to this agreement, the Vermont and Canada Railroad Company have caused the road to be located and graded, and have contracted for the iron, all with the knowledge and to the acceptance of the Vermont Central Railroad Company, and that the present agents and engineers who have thus far progressed in the contracts

and works, or others, not objectionable to the Vermont Central Railroad Company, shall continue to finish the same, and shall, in behalf of said Vermont Central Railroad Company, inspect and accept the work of building the said Vermont and Canada railroad from time to time, when, and as the same progresses, and is done; and the same being so, from time to time, accepted, shall be deemed to be an acceptance within the meaning of the foregoing articles.

And it is further mutually agreed, that in case it shall here-after become necessary, for the Vermont and Canada Railroad Company, in order to comply with the requisitions of their char-ter, to extend their road into the village of Burlington, or to any other point or points, by any route now located or which may be hereafter located, the said Vermont and Canada Railroad Company agree to grant, lease and demise, and so far as they have present legal authority, do hereby grant, lease and demise, unto the said Vermont Central Railroad Company, their succes-sors or assigns, the portions of their road, which may be so hereafter built, subject to the same conditions, restrictions and privileges, as are contained in the foregoing articles, and that the said Vermont Central Railroad Company, will accept the same when built, and will pay the same rent therefor, and in the same manner, and upon the same terms, and with the like remedies for non-payment as is heretofore specified in these articles; and it is hereby further mutually agreed that the Vermont and Canada Railroad Company, will appoint such person or persons, as the Vermont Central Railroad Company shall designate, as agent or agents, for the construction of such addition or additions as may be deemed necessary to be, hereafter, built as aforesaid.

And it is further declared that nothing herein contained, shall prevent the Vermont and Canada Railroad Company from resort-ing to an action at law, to recover any rent in arrear, if they shall choose to do so."

And further setting forth that these agreements were duly authorized, accepted and ratified, by both of said corporations; that the orators, in pursuance thereof, constructed and completed their road, and the Vermont Central Railroad Company accepted and took possession thereof in the fall of 1850, and since then had,

by themselves, or by trustees appointed under them, managed and run that road, in connection with the Vermont Central railroad, down to the date of the bill ; that the cost of the construction of the orators' road, prior to June 1st, 1854, was $1,350,000, upon which the rent reserved, being $108,000 annually, had been paid to the orators by the Vermont Central company, or their trustees, up to and inclusive of the rent falling due June 1st, 1854 ; but that no rent had been paid since that time, notwithstanding the same had been frequently demanded by the orators both of the Central company and their trustees hereinafter mentioned ; that in October, 1851, the Vermont Central company issued its obligations or bonds to the amount of $2,000,000, dated Nov. 1st, 1851, and payable in ten years from date, with interest semi-annually, at seven per cent., and in order to secure the payment thereof, on the same day executed a mortgage of their road, franchises and personal property to three persons in trust for such bond-holders ; that, at the time of bringing this bill, the defendants, John Smith, William Raymond Lee, and John S. Eldridge, held the position of trustees under said mortgage, and that the defendants, William Sohier and several others named in the bill, were holders of the bonds secured by that mortgage, and were made parties to this proceeding to represent such holders ; that on the 28th of June, 1852, the Vermont Central Railroad Company, by deed duly executed, surrendered possession of all the property and franchises conveyed in the last mentioned mortgage, to the trustees therein named, for the purposes therein mentioned, with a proviso in such deed of surrender that the trustees might deliver back such property and franchises, whenever in their judgment the interests of the bondholders would permit, and that the trustees accepted such surrender and took possession of the property, and had continued in the possession and management thereof down to the date of the bill ; that since the failure to pay the rent due the orators on the 1st of December, 1854, they had requested the said trustees to surrender to them the possession of the two railroads under their charge, together with the personal property used on and in connection with the same, in accordance with the agreements between the Vermont Central company and

the orators, set forth in the bill, but that the trustees had wholly refused so to do.

The bill also set forth the issue by the Vermont Central company of other bonds, and the execution by them of a second mortgage, to secure the same, to certain trustees, who were named in the bill.

The prayer of the bill was " that the said Vermont Central Railroad Company, and the said trustees, Smith, Lee and Eldridge, be ordered and decreed by the court to pay to your orator forthwith the amount of the rent so reserved and due, and payable to your orator on the 1st day of December, A. D. 1854; and that in the meantime, and until such rent is paid to your orator, that the said Smith, Lee and Eldridge be ordered to allow your orator to enter and take possession of, and use and run the Vermont and Canada railroad and the Vermont Central railroad, with all lands, depots and other property, rights and privileges now owned and enjoyed by your orator or the said Vermont Central Railroad Company, and used by the said trustees, Smith, Lee and Eldridge, in connection with, or for the purpose of running or working said railroads, and all engines, cars, tools, machines, machinery, equipment and other personal property, now in possession of said trustees, and used by them in connection with, and for working, running, or repairing said railroads, or managing the business thereof, and which the said trustees, or any of them, received or now hold under such deed of trust or deed of surrender as aforesaid, or which they or the said Vermont Central Railroad Company have purchased for the purpose of running, working, or repairing said roads ; and that they be ordered to allow your orator forthwith to receive all tolls, fares or other lawful income, receivable for the use of the said railroads, and pay therefrom all reasonable expenses, for running or working said railroads, and of making all such repairs of each of said railroads, or any building or structures connected therewith, or used therefor, and the cost of all such engines, cars and other furniture as may be necessary during the time or times your orator shall work or run said roads, and apply the residue of such receipts in and towards the payment of all rent now due, or which may

become due while your orator has the possession of said roads ; and that the said Smith, Lee and Eldridge, and all persons acting by or under their authority in or about the working of the said roads, or the repairing of the same, or the collection of the tolls thereof, be enjoined by order of this court from running, working or repairing said roads, or using or possessing the cars, engines, equipment or other personal property now used in connection with, or for running, working or repairing said roads, or managing the business thereof, and from receiving or collecting any tolls, fares or profits or earnings of said railroads, receivable for business done on such roads after this date, except as they may be authorized so to do, by the authority, direction and consent of your orator, and that your orator may hold possession of said roads, and run, work and repair the same, and manage the business thereof, and receive the earnings thereof, and pay out and disburse such earnings pursuant to the aforesaid indentures between your orator and the Vermont Central Railroad Company, or upon such other terms, and in such manner, for such purposes, and upon such conditions as to this court shall seem just. Or else, if it should not seem fit to the court to make such order, then that this court appoint some suitable and responsible person or persons to be the receiver or receivers and the manager or managers of the said Vermont and Canada and Vermont Central railroads, and all of the real and personal property now in the hands of said Smith, Lee and Eldridge, trustees as aforesaid, and used by them in running, working and repairing said roads, and in the execution of their said trust to run and work and repair said railroads, and receive all the earnings and make all needful repairs, and manage all the business of the said roads, and pay out of said earnings for all needful expenses, and to do all other things proper and necessary to be done, in carrying on and managing the business of the road, and subject to such orders, directions, conditions, limitations and terms as this court shall deem proper and necessary to secure the rights of your orator, and of all other persons interested in the same ; and that this court may make such further order and decree in the premises as to the appointing of a receiver or manager, or receivers, of the earn-

ings of said railroads and property, as to the court shall seem fit, and that your orator may have such further or other relief in the premises as justice and equity may require.

And your orator further prays, that the said defendants, and each of them, their and each of their servants, agents, workmen and attorneys and all other persons acting under them, or either of them, be immediately restrained by order of this court, and until further direction of the same, in that behalf from in any manner hindering, molesting or interfering with your orator, its servants and attorneys, in the taking of the possession under said indentures of the said roads, and other real estate, rolling stock, fixtures, machinery and other things, personal or real, to the said roads or either of them appertaining, or used in the business thereof, or by the said Smith, Eldridge and Lee held or used under their said alleged trust, and from receiving or discharging any of the rents, profits or income of the matters aforesaid."

The answers of the Vermont Central Railroad Company, and of the trustees under the first mortgage of that company's property, admitted the legality and binding force of the indentures set forth in the orator's bill, so far as they were designed to lease the property of the orators therein described, and to give security upon the earnings of the roads for the payment of the stipulated rent. They denied the right of the orators to possession of the roads and property under the indenture of July 9th, 1850, claiming that to that intent it was illegal and invalid. They also denied the correctness of the claim of the orators as to the amount of the cost of constructing the Vermont and Canada road, insisting that such cost was much less than the amount stated in the bill.

The answer of the defendant Sohier set forth " that by the original act of incorporation of said Vermont and Canada Railroad Company, which was approved and took effect October 31st, 1845, and which (with the exception of that portion which required the railroad to pass across the sand bar to South Hero,) was in full force at the time of the execution of the several agreements or indentures, between that company and the Vermont Central Railroad Company, was authorized (among other

3

things) to build a railroad with a single or double track, from some point in Highgate, on Canada line, thence through the village of St. Albans, to some point or points in Chittenden county, most convenient for meeting a railroad to be built on the route described in the act to incorporate the Vermont Central Railroad Company.

And also, to extend a road from any point on the aforesaid route, to some point on the western shore of Grand Isle county, passing across the sand bar to South Hero, as the said company might thereafter designate.

The said original act of incorporation, containing no other provisions, restrictions or directions relative to the place where said railroad should be located, or the route upon which the same should be built, and no provisions, restrictions or regulations, concerning the running of trains upon said road, by the said Canada company, its lessees or assigns ; but leaving the location of said railroad, within the limits aforesaid, and the manner and times of running trains thereon, and the general control and management of said road wholly to the discretion of said company, subject only to the general. laws of the state.

That, in and by said original act of incorporation, it was expressly declared and enacted, as follows :

SEC. 2.—If said corporation shall not, within five years, complete the survey of said road, and within seven years from the passage of this act, construct and finish and put in operation, one fourth part of said road, and within teny ears from the passage of this act, construct and put in operation one-half of said road, and shall not within twelve years from the passage of this act, complete and put in operation the whole of said road, then the rights and powers, granted by this act, shall cease for such parts of said road as shall not be completed within the several periods aforesaid, but shall be valid for such parts of said railroad as shall be completed within the said periods respectively.

And that in and by said agreement or indenture, between the said Vermont Central and Vermont and Canada Railroad Companies, of August 24th, 1849, said Vermont and Canada company expressly stipulated, covenanted and agreed to construct

and finish its said railroad, in conformity with the provisions and requirements of said act of incorporation, and to do and complete all arrangements and things in a proper and legal manner, so that the right and title of said company to said road and to the use of it, should be clear and unquestionable.

And especially undertook, covenanted and agreed, that the road should be so built, constructed and located by them as to entitle and give to the Vermont Central Railroad Company, the full, sole and undisputed right to the use and enjoyment of the same, and the control of traffic thereon, subject only to the requisition of their said charter, in such manner as that between the extreme termini mentioned therein, no competition by railroad could by possibility exist, adverse to the interests of said Central company or this defendant; and your respondent avers, that the foregoing stipulations and covenants on the part of the Vermont and Canada company, was the only consideration for, or on account of which said contract was ever made or contemplated by the Vermont Central Railroad Company.

And this defendant, further answering, saith, that the aforesaid stipulations, covenants and agreements of the said Vermont and Canada company, constituted a material and important part of the consideration for the covenants, and agreements of said Vermont Central company, contained in said several agreements and indentures, set forth in said bill of complaint.

And this defendant believes, and so avers the fact to be, that said Central company executed said agreements or indentures relying upon the performance of said covenants, and agreements so made and entered into by the Vermont and Canada company contained in said indentures, and supposing that said Vermont and Canada company would, within the period specified in said act of incorporation, complete and finish its said railroad, meeting the railroad to be thereafter built upon the route described, in the act to incorporate the Champlain and Connecticut Railroad Company, at the village of Burlington, and connecting said last mentioned railroad with the Canada line, in the town of Highgate, and would in all other respects, comply with the provisions of its said charter.

Vermont and Canada R. R. Co. *v.* Vermont Central R. R. Co. et al.

This defendant further saith, that the railroad on the route described in the charter of said Champlain and Connecticut River Railroad Company, (now by change of name called Rutland and Burlington Railroad Company,) was built, completed and put in operation as early as 1850, or thereabouts, and has ever since been, and still is in operation.

That the time limited, in and by said act of incorporation of said Vermont and Canada company, for the building and completion of its said railroad, connecting said Champlain and Connecticut road, (now called Rutland and Burlington railroad,) with Canada line, as aforesaid, has long since elapsed ; that said Vermont Central Railroad Company, as this defendant is informed and believes, long before the expiration of the time limited for that purpose, by said act of incorporation, to wit : in or about March, 1854, expressly requested said Vermont and Canada company to complete its said road according to the requirements of its said charter, and the express stipulations and covenants of said Vermont and Canada company, contained in said indenture of August 24th, 1849 ; and that the said last named company, without any just or legal cause whatever, has hitherto wholly and wilfully neglected and refused to build its said road, to any point in the village of Burlington, or in any manner to connect the same with said railroad so built upon the route described, in the charter of said Champlain and Connecticut River Railroad Company as aforesaid, nor has the said Vermont and Canada company extended or constructed its road to any point on Canada line.

This defendant further saith, that the said Vermont and Canada company, having thus neglected and refused to build its said railroad, connecting the said Rutland and Burlington railroad with the Canada line, made application,as this defendant is informed and believes, to the legislature of Vermont at its regular session, in 1858, for an alteration or amendment of said charter ; and thereupon it was enacted by said Legislature, as follows :—

"Sec. 1. Section two of the charter of the Vermont and Canada Railroad Company, approved October 31, A. D., 1845, is hereby so amended that it shall read as follows : "If said company shall not, within five years, commence the construction of the road, and shall not, within seventeen years next after the

31st day of October, A. D., 1845, complete and put in operation said road, from a point in the village of Burlington most convenient to connect at said village of Burlington with the railroad running southerly from said village, now called the Rutland and Burlington railroad, connecting such southerly road, by a line of said Vermont and Canada railroad running from the most convenient point of connection in said village of Burlington, with said Rutland and Burlington railroad, to some point west of the town house in the town of Colchester ; and thence to connect with the present track of the Vermont and Canada railroad, at the most suitable and proper point in the town of Milton ; thus connecting said southern line, as well as the Vermont Central line, by the most convenient and direct route, with the northern terminus of said Vermont and Canada Railroad,—then this corporation shall cease and the charter thereof be void."

Sec. 2. The foregoing amendment of said charter, and the extension of four years beyond the time originally given by said charter for the completion of said road, is granted, upon the express condition that said company conform to and obey the following requisitions and provisions, as well as the other provisions of this act, namely :—" That said company shall, within nine months after the passage of this act, survey and locate that part of its line mentioned in section one of this act not already built, according to the true intent and meaning of this act, and expend in the construction thereof, upon such location north of Onion River, fifty thousand dollars before the first day of September, A. D., 1859, and fifty thousand dollars more upon said line so located within eighteen months from the passage of this act ; that said company shall, within four years from the 31st day of October, A. D., 1858, complete and put in operation the same, so as to make one continuous line of said road from such point of connection in the village of Burlington, to the northern terminus of the Vermont and Canada railroad ; that said road when so completed shall be forever run and operated over said extension, so as to put said Rutland and Burlington railroad upon an equal footing in respect to the convenient transmission of freight and passengers, and the charges therefor, over and upon said Vermont and Canada railroad, each way and in connection

therewith, with the Vermont Central line, subject in case of disagreement to the decisions of the commissioners mentioned in the fifteenth section of the charter of the Vermont and Canada Railroad Company; that all passengers passing from Burlington over the extension hereby ordered to be built, and over said Vermont and Canada railroad to the northern terminus of the last named road, or to any intermediate station, and all passengers passing over the same roads from said northern terminus or from any of said intermediate stations to said Burlington, shall be carried without delay and without change of cars, except in case of accident or other casualty; that until said Vermont and Canada railroad shall connect with said Rutland and Burlington railroad, as hereinbefore provided, said Vermont and Canada railroad shall, so far as it has or hereafter may have the legal right, without impairing any of its present legal rights or obligations to those which may arise from present obligations, give to the said Rutland and Burlington the same rights, privileges, and advantages to and from Burlington, over the Vermont Central railroad to and from Essex Junction, and thence over the Vermont and Canada railroad to and from Rouse's Point, as is conferred upon said Rutland and Burlington line, by the name of the Champlain and Connecticut River Railroad Company, over said Vermont and Canada railroad, by the fifteenth section of the act incorporating said Vermont and Canada Railroad Company, and, in case of disagreement, all questions in relation thereto shall be determined by commissioners and the supreme court on their report, according to the provisions of said fifteenth section."

SEC. 3. If said Vermont and Canada Railroad Company shall not, by a legal vote of its directors, duly passed and filed with the Secretary of State, accept this act within forty-five days next after the passage thereof, or if it shall fail to perform and fulfill all the requirements, conditions, and provisoes of this act, in either case said company shall take no benefit of any of the provisions thereof.

SEC. 4. This act shall take effect from its passage.

Approved, November 18, 1858."

Which said act having been approved by the Governor of Vermont, on the 18th of November, 1858, was afterwards, and within forty-five days next after its passage, as this defendant is informed and believes, duly accepted by said Vermont and Canada Railroad Company, in the manner provided by the third section of said act, and thereby became, was and still is in force, and binding upon the company.

This defendant further saith, that the said Vermont and Canada company has not complied with, or performed any of the conditions or requisitions of the second section of said last mentioned act, although the time for the performance of some of said conditions and requirements has elapsed, and that by reason of such neglect of said company, its charter is forfeited.

And this defendant insists, that by reason of the neglect of the said Vermont and Canada company, to build and complete its road, so as to meet said Rutland and Burlington railroad, in the village of Burlington, and to connect the same with the Canada line in Highgate, within the time specified, in said original act of incorporation of said Vermont and Canada company, and in accordance with the covenants of said company contained in said indentures; and also, by reason of the passage and acceptance of said act of 1858 as aforesaid, and the non-performance of the conditions contained in the second section of said last mentioned act, the said Vermont Central company has been, and is now wholly absolved and discharged from all legal or equitable duty or obligation, to perform any of the covenants or agreements on its part, contained in said indentures; that said indentures or agreements have become and are utterly null and void, and that the said Vermont and Canada company has no claim, right or lien to, in or upon any of the property of said Central company.

That the consideration for the making of said indentures or agreements, by said Central company, has wholly failed from the acts and omissions of the Vermont and Canada.

That the execution of said covenants and agreements, according to the true intent and meaning of the parties, has become and is impossible, through the aforesaid acts and omissions of the Vermont and Canada company.

That the Canada company has not, in fact, granted or demised, or conveyed, nor can it grant or demise to the Central company, the rights and privileges which it, the Vermont and Canada, undertook, and guaranted to grant and demise; and that it is utterly inconsistent with the principles of equity and good conscience, as administered by this honorable court, to hold or adjudge the Central company bound by said contracts or agreements.

That the conditions precedent for the making of said contract, to be performed by the Canada company, have not been performed, and that the aforesaid company has now accepted a new charter, by the effect of which it is unable to grant or demise to the Central company, those rights or privileges, which by said contract or agreement, it undertook to grant and demise, and for the possesion of which alone, the Central company made said contract.

These answers were all traversed, and testimony was taken on both sides. Before the final hearing of the cause before the chancellor, receivers were appointed by the court, who took possession of the two roads and property in question, and managed the same under the direction of the chancellor.

It appeared that the following act was passed by the Vermont legislature, at the October session, 1858.

" SEC. 1. In case the Vermont and Canada Railroad Company shall omit to accept the act entitled, " An act in addition to and in amendment of an act entitled ' An act to incorporate the Vermont and Canada Railroad Company,' approved October 31, 1845," within the time prescribed by said act ; or in case the same shall be accepted, as in said act provided, and said Vermont and Canada Railroad Company shall fail to comply with the provisions of said act by the times therein prescribed, and its charter shall thereby become forfeit,—it shall be lawful for the receivers and managers of said road to continue to operate the same until the first day of January, A. D. 1860, and until otherwise provided, under the direction of the chancellor having jurisdiction of the suit in chancery in which said receivers and managers were appointed, who may require such persons to give bonds for the faithful management of said property, and for a

faithful accounting for all the earnings of said road, and may order and direct such persons to account from time to time to said chancellor as he may direct : *provided*, nothing in this act shall be construed to give effect to the same, only in the event of the forfeiture of the charter of the said company.

SEC. 2. The said chancellor shall have power to order such persons to give to the Rutland and Burlington railroad such business connections and facilities for freight and passengers as to him may appear just and equitable.

Approved Nov. 25, 1858."

Among other facts disclosed by the testimony, it appeared on the 25th June, 1850, the following notice was published in certain newspapers, in accordance with the by-laws of the company regulating such notices, viz :

"VERMONT CENTRAL RAILROAD COMPANY.

"A special meeting of the stockholders is hereby called, at Windsor, Vt., on the 9th day of July next, at two o'clock P. M., for the purpose of acting on a lease of the Vermont and Canada railroad, and the other arrangements connected therewith.

By order of the Directors,<br>
E. P. WALTON, JR.,<br>
Clerk Vt. C. R. R. Co."

That a meeting was held in pursuance of this notice, at which the indentures dated August 24th, 1849, January 11th, 1850 and July 9th, 1850, were read, and the following vote was then unanimously adopted:

" *Voted*, That the contract which has just been read in reference to the leasing of the Vermont and Canada railroad, and the other arrangements connected therewith, be, and hereby is approved by the stockholders, and that the President, in behalf of the corporation, be authorized to sign the same, and affix the seal of the corporation."

At a previous meeting of the stockholders of the Vermont Central Railroad Company, held on the 24th of August, 1849, it was voted " that the Vermont Central Railroad Company does duly accept the act of the legislature of Vermont, approved

November 6th, 1847, entitled ' An act in relation to railroads.' " (Acts of 1847, No. 22, page 18.)

The portion of this act material to the points involved in this case, is as follows :

" All railroad companies incorporated, or which may be incorporated, under the authority of this State, shall have power to make contracts and arrangements with each other, and with railroads of other States, for leasing or running their roads or any part thereof, * * * * and also to purchase and hold such personal property as shall be necessary and convenient for carrying into effect the object of this act."

The authority of the Vermont and Canada company, on its part, to enter into the contracts of lease, &c., set forth in the orator's bill, was not denied by the defendants.

It further appeared that at the session of the legislature of Vermont held in October, 1859, the following act was passed :

" SEC. 1. Section two of the charter of the Vermont and Canada Railroad Company, approved October 31, A. D. 1845, is hereby so amended that it shall read as follows :

" ' If said company shall not within five years commence the construction of the road, and shall not within eighteen years next after the 31st day of October, A. D. 1845, complete and put into operation said road, from a point in the village of Burlington most convenient to connect, at said village of Burlington, with the railroad running southerly from said village, now called the Rutland and Burlington Railroad, connecting such southerly road by a line of said Vermont and Canada railroad, running from the most convenient point of connection in said village of Burlington with said Rutland and Burlington railroad, and thence to connect with the present track of the Vermont and Canada railroad at the most suitable and proper point, thus connecting said southern line, as well as the Vermont Central line, by the most convenient and direct route, with the northern terminus of said Vermont and Canada railroad, then this corporation shall cease, and the charter thereof be void.'

" SEC. 2. The foregoing amendment of said charter and the extension of five years beyond the time originally given by said charter for the completion of said road, is granted upon the

express condition that said Vermont and Canada Railroad Company shall accept, conform to, and fulfill the following requisitions and provisions, as well as all the other provisions of this act, namely :

" 'That said company shall, within eighteen months after the passage of this act, construct and finish a railroad from the most convenient point of connection on the lake shore in said village of Burlington, with said Rutland and Burlington railroad, thence northerly and easterly through the sand bank so called, as near as practicable on the route of the Vermont Central railroad, as originally surveyed and partly worked, to a point of junction with the present line of the Vermont Central, at or near the railroad bridge, at Winooski, over the Winooski river, and that said company shall within five years from the thirty-first day of October, 1858, complete, and put in operation its road, so as to make one continuous line of said road, from such point of connection in the village of Burlington, to the northern terminus of the Vermont and Canada railroad: that said road, when so completed, shall be forever run and operated over said extension, so as to put said Rutland and Burlington railroad upon an equal footing in respect to the convenient transportation of freight and passengers, and the charges therefor, over and upon said Vermont and Canada railroad, each way, and in connection therewith, with the Vermont Central line, subject, in case of disagreement, to the decision of the commissioners mentioned in the fifteenth section of the charter of the Vermont and Canada Railroad Company : that all passengers passing from Burlington over the extension to be built, and over said Vermont and Canada railroad, to the northern terminus of the last named road, or to any intermediate station, and all passengers passing over the same roads, from said northern terminus or from any of said intermediate stations, to said Burlington, shall be carried without delay, and without change of cars exept in case of accident or other casualty ; that all passengers passing from Burlington over any part of the line of said Vermont and Canada railroad, or over the Vermont Central railroad, to Northfield, or to any station intermediate between Northfield and Burlington, and all passengers passing from Northfield, or from any station

intermediate between Northfield and Burlington, to said Burlington, shall, whenever and so long as the Vermont and Canada Railroad Company, or any officer, corporation or person claiming or holding through, or under, or in the right of the said Vermont and Canada Railroad Company, shall have the possession, control or direction of the Vermont Central line, or the running of trains thereon, between said Northfield and Burlington, be carried without change of cars, except in case of accident or casualty, and without unnecessary delay; that until said Vermont and Canada railroad shall connect with said Rutland and Burlington railroad, as hereinbefore provided, said Vermont and Canada railroad shall, so far as it has, or hereafter may have, the legal right, give to the said Rutland and Burlington the same rights, privileges and advantages to and from Burlington, over the Vermont Central railroad to and from Essex Junction, and thence over the Vermont and Canada railroad, to and from Rouse's Point, as is conferred upon said Rutland and Burlington line, by the name of the Champlain and Connecticut River Railroad Company, over said Vermont and Canada, by the fifteenth section of the act incorporating said Vermont and Canada Railroad Company, and in case of disagreement, all questions in relation thereto, shall be determined by commissioners, and the Supreme Court on their report, according to the provisions of said fifteenth section.'

" Sec. 3. The act entitled ' an act to incorporate the Vermont and Canada Railroad Company,' approved October 31st, 1845, and the several acts in amendment of, or in addition to, the same, shall at all times be subject to the control of the General Assembly, and may be altered, amended, modified or repealed, as the public good may require.

" Sec. 4. If said Vermont and Canada Railroad Company shall not, by a legal vote of its directors, duly passed and filed with the Secretary of State, accept this act, within six months next after the passage thereof, or if it shall fail to perform and fulfill all the requirements, conditions and provisions of this act, in either case said company shall take no benefit of any of the provisions thereof.

" Sec. 5. This act shall take effect from its passage."

Vermont and Canada R. R. Co. *v.* Vermont Central R. R. Co., et al.

The cause was referred to special masters to ascertain and report the cost of the construction of the Vermont and Canada Railroad, together with the incidental expenses of that company, and the amount of rent in arrear due them. In the masters' report they stated that in April, 1857, the two corporations having previously been unable to agree upon the amount of the cost of such construction, committees from the two companies met, and after consultation agreed to compromise their differences by having the Vermont and Canada acknowledge itself indebted to the Vermont Central company in the sum of thirty-two thousand six hundred and seventy two dollars and fifteen cents, and this agreement was subsequently in April, 1857, sanctioned by the votes of both boards of directors. The masters further reported in reference to this claim as follows :

"There was no examination of the accounts of either company, but the sums above stated were respectively agreed upon solely by way of compromise. There was no evidence tending to show how, when, or for what purpose that sum of thirty-two thousand six hundred and seventy-two dollars and fifteen cents, acknowledged to be due from the Vermont and Canada to the Vermont Central company, accrued, or that it had any connection with the building of the Vermont and Canada road, or the incidental expenses thereof. For the conditions and details of that settlement and compromise, we refer to the testimony of Levi Underwood and John G. Smith, taken in this case and hereto attached, and we find the statements therein made to be true.

For want of evidence to prove that any such indebtedness actually existed against the Vermont and Canada company, and, if it existed, to prove that it could properly be charged to the building of the Vermont and Canada road, or the incidental expenses thereof, we have disallowed the item."

The cause was heard at the April term, 1860, before POLAND, CHANCELLOR, who rendered a decree for the orators, in accordance with the prayer of the bill, and ordered that the two roads be kept in the hands of the receivers, and subject to the control of the court.

Vermont and Canada R. R. Co. v. Vermont Central R. R. Co. et al.

The decretal order proceeded as follows :

" Let a decree therefore be entered for the orators in accordance with the prayer of their bill ;   and that they are entitled to receive  rent upon  the basis found and reported by the masters ; and  also that  they are entitled to the amount  of rent in arrear as reported by them, and also to future  rents  semi  annually  on the same basis.   The orators are also  decreed their  costs  in the cause.   The said receivers are also  ordered, on their accounts being properly settled and passed, to pay over whatever sum may be  in their  hands  to  the orators in satisfaction of said rents  so far  as  the same will  be sufficient, and have satisfaction entered to that extent; all sums which have been advanced tò the orators under orders from the Chancellors, or otherwise, to be applied and accounted for by the orators as  payment towards  said  rents at the  dates  of such payment.   It is further ordered that said road and property remain in the  hands of  said  receivers,  Lawrence Brainard, Joseph Clark and John Gregory Smith to run, manage and control the same under  the direction of  the court as heretofore, and to pay over from time to time as the same may accrue, the proceeds and earnings of  said property to  the orators, until their claim for rents as established by this decree shall be fully paid together with their costs  in  this  cause.   And it is ordered that said receivers on the first day of  January and  July of  each year, or as soon thereafter as may be, make a report to the court, verified  by the oath of a  majority of them,  of  the earnings of said roads, the cost of  operating and keeping the same in repair, including  their  own  charges and  expenses,  and  generally the condition and  state of the property ; and  also  the amount and date of all payments  made to the orators, under this decree, and to hold said property and  funds arising  therefrom  at  all times subject to the  order and direction  of  the court."

From this decree both parties appealed.

*George F. Edmunds* and *Lucius B. Peck*, for the orators.

I.  Were the indentures set forth in the bill binding on the two corporations ?

a.  The statute of  1847, (act of November 6th, 1847,) answers

JANUARY TERM, 1861. 31

Vermont and Canada R. R. Co. *v.* Vermont Central R. R. Co. et al.

the question so far as the corporations as such, and the public are concerned.

*b.* But it may be said that as this was an arrangement not contemplated in the charter of the Central, the Legislature could not thus enlarge the powers of the corporation so as to bind any stockholders who did not assent thereto.

All this *may* be true, and not at all touch the question in this case, for where the *law* authorizes the corporation to do the act, the *sole* right of objection resides in the stockholders *individually*, and until by proper proceedings they do object, the corporation cannot set up such a defence.

A corporation cannot, any more than an individual, repudiate an act which the law has allowed it to do. See note, Red. on R., 581; id. ch. 24.

*c.* The act being lawful, whoever had a right to object to the arrangement, was bound to do so, immediately upon the contract being made ;—even from stockholders, in such a case, the law requires *active diligence* if they seek to oppose such acts.

This contract then, having been carried into execution, and the road built and used by the Central company and the trustees, under this contract, *and even now held under it*, and recognized in every conceivable way ; it is now quite too late to set up any such fraudulent defence. 9 Mass. 423, *Little* v. *O'Brien ;* 16 Mass. 102, *Chester Glass Co.* v. *Dewey ;* 7 Met. 275, *Quincy Canal* v. *Newcombe ;* 3 Cond. Ch. 52, *Gray* v. *Champlin. ;* 2 Atk. 41, *Elliott* v. *Merryman ;* 6 E. L. & E. 132, *Graham* v. *Birkenhead R. Co.;* Story Eq. 1520. Red. on R. 510.

II. It is claimed that the fact that the Canada road has not been built into Burlington and to Canada line in Highgate, furnishes a complete defence to this suit. In other words, that the defendants may keep possession of the orator's property and refuse to pay for its use, and thus deprive the orator of the ability to finish its road, and then make use of such fact as an *equitable* defence to the suit ! The answers to this extraordinary proposition are numerous.

*a.* So far as the fact that the charter of the orator is in danger of forfeiture, is included in this point, it may be disposed of in a word.

1. It is not yet forfeited, but is valid.

2. No one but the *State* can take advantage of a forfeiture, should one occur, and hence had the charter actually expired, it would be no defence.    24 Vt. 228, *Brandon 1. Co.* v. *Gleason;* Ang. & A. on Corp., s. 777 & n.

3. There is no certainty or probability that the charter will be forfeited ; the history of legislation is pretty full evidence that the state will only insist on just and proper performance.

*b.*  As to this clause in the charter viewed under the contract :

1.  By the instrument of August 24, 1849, the Canada was to be built on such location as should be approved by the Central, or their agent.    The Essex location was made and approved. No location has ever been made of the branch to Burlington.

2.  The demise is only of the Canada, "as the same is now located or as the same shall be hereafter located and constructed," with all the rights of the Canada under its charter " or any *additions to be made thereto.*"

3. But if it could be open to any question on the contract of August 24, 1849, as to what the parties intended, the contract of July 9, 1850, certainly leaves it clear.

It is there stated that the true meaning of the articles, is that when the Canada shall have finished its road agreeably to the contract, it shall have no further right to expend money on it. And that " *in accordance*" therewith, the Canada "have caused the road to be located and graded," &c., all with the knowledge and to the *acceptance* of the Central, and that when such work should be finished, &c., it should be *an acceptance,* under the contract.    All this relates only to the line to Essex, and clearly shows that, that (it being built,) was all the Canada *was bound to do.*

III.  As to the claim set up in Sohier's answer relating to the effect of the legislation of 1858 and 1859 :

We submit that it has no effect upon the rights of the Canada in this suit.

*a.*  As has been before mentioned, the charter of the Canada required that a connection should be made with the Rutland and

Burlington railroad and the lease contemplated that " *additions* " might be made to the charter.

*b.* And the lease, in view of this, expressly provided that, " in case it shall hereafter become *necessary* for the Vermont and Canada Railroad Company, in order to comply w th the requisitions of their charter, to extend their road into the village of Burlington, or to any other point or points by any route now located or *which may be hereafter located,*" the Canada shall lease such extension to the Central, &c.

Thus there was no obligation to locate or build the extension in any particular place, or *within any particular time.* All this was left to such arrangements as the Canada might make with the legislature ; but when the Canada should at last be driven to it, the Central should take and control and pay for the new line.

*c.* In this state of things the acts of 1858 and 1859 were passed, but it is only needful for us to consider the act of 1859, as that took the place of the act of 1858.

That act grants an extension of time for the building of the extension, and requires the Canada to begin and build on a certain route, for a short distance.

This surely cannot be claimed as in any way injurious to the defendants.

The state in fixing to a certain extent, the route, exercised its right of eminent domain in designating the private property which might be taken ; and it does not appear that this route is not the one the Canada would have chosen ; and in pursuance of the very terms of the lease the Central has approved it.

*d.* But suppose even, that the effect of this legislation is such that the defendants would not be *bound* to accept and pay rent upon this new line. It is apparent from the lease and the action under it, that this matter of the extension was a wholly contingent and independent matter, having nothing to do with the rights of the parties as to the existing line. It was regarded as an evil which was to be evaded, postponed and modified on the part of the Canada, as long and as much as possible. It is, therefore, wholly premature to consider what *may be* hereafter the rights and duties of the parties in regard to it,

4

VI. It is claimed that this contract and pledge cannot operate upon the rolling stock, &c., acquired by the Central and trustees from the income of the roads, but that the sole security of the orator is upon that stock *in esse*, at the date of the contract.

*a.* The language of the instrument covers it. It is of all property used in running the roads, &c., that the orator may take possession.

The subsequent incumbrances are made expressly subject to this right, and were accepted so by the defendants, and under which they now hold possession.

Such property would, in equity, be the subject of assignment or mortgage; Story's Eq. 1040, 1055; but this case is much stronger; there is no attempt to pass a title, but only to contract for a specific thing to be done upon property in a certain condition at the time the event is to happen; and to this all parties have agreed. The technical rule of law does not therefore at all apply in any sense.

*b.* Again; as between the parties to this contract and their privies (which includes all the defendants) this species of property is a mere incident to and parcel of the general property, and may and should go with it in all transfers of the principal thing.

*c.* All these rights are mere trusts, and the only question is one of priority, and that, the instruments themselves settle. See, *Ludlow* v. *Hurd et al*, Law Register, June 1858, and cases cited; Red. on R. 576, n.; id. 589, 590; 32 N. H., *Pierce Emery, Stevens* v. *Buffalo and Corning R. Company* before JOHN-SON J.

VII. As to the sum on which rent is to be computed.

We claim that this cost is now, after the lapse of *ten years* since the work was begun, and after the lapse of *six years* before any question or objection was made by any of the defendants as to the amount of it, to be decided upon the general evidence of the acts of the parties while the work was going on, and at its substantial completion in the fall of 1852, and the spring of 1853, and therefore the cost is the sum of $1,348,500, besides the sum agreed to be due to the Central in 1857, for work on the road not before paid for, being $32,673 15.

Vermont and Canada R. R. Co. *v.* Vermont Central R. R. Co. et al.

It is a general principle of law and equity of universal application, that in the matter of the construction of executory agreements and the correctness and adjustment of accounts, the contemporaneous exposition by the parties to such contract and accounts, in the absence of fraud *establishes* the rights of all the parties and privies, and all claiming under them.

The trustees under the first mortgage knew that the work and its costs, and what was costs, *was a matter solely between the two corporations to regulate in their own way* (provided of course they did it in good faith,) and they must have known in what way it had been done from the first, and so, by force of the lease and the actual transaction, were as much bound by the *continuance thereafter* of the *same course of dealing* as they were by that which had already happened.

On the first of July, 1852, the trustees of the first mortgage took possession of both roads, and used the same, including the bridge &c., at Rouse's Point, *and paid the rent without objection, computed on the stock outstanding,* and so continued to do down to December first 1854.

As to the increased cost above $1,348,500, found by the settlement of 1857 ;—we submit that it is perfectly manifest it ought to be added to that sum, because :

The two sole parties to those accounts " compromised " by the Central yielding the largest part of her claim, and by offsets on the part of the Canada, for materials, &c., thus *reducing* the building debt to the Central, to about $32,000, and so *diminishing* the cost of construction below what it *really* was.

As to this settlement and judgment, we insist that, as the dealings were, by the original contract, solely a matter between the two companies, whatever adjusts them in good faith between the companies, concludes all collateral and subsequent parties. There cannot be one adjudication and one rule for the principal party to the lease, and another for its grantees. In all such cases the act of the principal must bind the accessory ; 19 Vt. 410, *Porter* v. *Bank of Rutland* ; 12 Vesey 354, *Morse* v. *Royal* ; Powell on Mort., vol. 3, p 953, a.

*Levi Underwood* and *Andrew Tracy*, for the Vermont Central Railroad Company, and the trustees of the first mortgage.

Vermont and Canada R. R. Co. v. Vermont Central R. R. Co et al.

1. The validity and construction of the contract of July 9, 1850.

We do not at this time deny the power of a railroad corporation to pledge its tolls, in such a manner that a court of equity may enforce the application of them to the purposes of the pledge.

But we deny the right of a corporation to make a contract to forfeit its own existence, or put its control into the possession of another corporation.

Corporations created for particular purposes with limited powers, cannot by their own inherent contracting powers enlarge their charters and extend their business beyond the scope of their original charters.

If a corporation desires an increase of power or an enlargement of its business, it must seek it at the hands of the legislature from whom its powers were originally derived, and this must be assented to by all the stockholders individually.

So far as the contract of July 9, 1850, is a pledge of the tolls of the two roads to the payment of the rent of the orator's road under the lease, giving the orator a priority over other creditors, it may be upheld and the court may give it effect by lending its aid to ensure the application.

Beyond this we claim that it is entirely outside the chartered powers of either corporation and is not warranted by the act of 1847, authorizing leases. 6 E. L. & Eq. 106 ; 13 id. 506 ; 19 id. 513 ; 21 id. 319 : State v. B. C. & M. R. R. Co. 25 Vt. 442–3 ; Stevens v. R. & B. R. R. Co., pr. Bennett Chancellor ; Beatty v. Knowles, 4 Pet. 152 ; Angell & A. on Corp. sec. 111, 536–7 ; N. H. & Hartford Co. v. Croswell, 5 Hill 383 ; Providence Bank v. Billings et al., 4 Pet. 514 ; Mayor of Norwich v. N. R. R. Co., 30 E. L. & Eq. 132 ; Bustock v. N. S. R. R. Co., 32 E. L. & Eq. 101 ; N. O. & J. & Gr. N. R. R. Co. v. Harris, 27 Miss. 517 ; Redfield on Railways, p, 23, 399–400–1, note, 408, 116, 117, 576 ; Livingston v. Lynch, 34 J. Ch. 573.

2. What is the effect of the non-completion of the Vermont and Canada road upon the right or the Vermont and Canada to take possession of the two roads under the contract of July 9, 1850 ?

The lease provides that the Vermont and Canada company shall forthwith provide the necessary funds and proceed with all reasonable despatch to construct the Vermont and Canada rail-

road, its fixtures and buildings, to settle and pay all land and other damages, and to do and complete all other arrangements and things in a legal and proper manner, so that their right and title to said road shall be clear and unquestionable. "It being understood and agreed that the several sections and portions of said Vermont and Canada road shall be constructed at such limitation of costs, within such time, on such location and in such a way and manner in all respects as shall be satisfactory to and be approved by the directors of the Vermont Central Railroad Company."

The second section of the orator's charter provides that "If the company shall not within five years commence the construction of the road, and shall not within thirteen years complete and put in operation said road connecting the roads to be built by the Champlain and Connecticut River Railroad Company, and by the Vermont Central Railroad Company, with Canada line, then this corporation shall cease and this act be void."

This is a condition precedent to be performed by the orator before it can claim that the Vermont Central shall lose the right to control its own property. And it must be performed before the orator can have the aid of a court of equity to enforce either a specific performance or a forfeiture.

We do not claim that the orator is not entitled to a fair compensation for the rent of its road which has been built, or that the charter has become *ipso facto* void by the omission to build the road as provided by the charter. But we insist that the omission to build has subjected the charter to forfeiture, and hence the right and title to said road is not "*clear and unquestionable,*" and having by its own act incurred a forfeiture, it cannot ask a court of equity to deliver possession of the property in pursuance of a contract thus violated on its part, and allow it to execute the contact upon the part of the defendant.

If the property is ordered into the possession of the orator, as prayed for, this suit must end and the court lose its control over the property, and thus the party who first violated the contract is allowed to take upon itself the performance of its own covenants and those of the defendant without the supervision of the court. 3 Story Eq. Jur. sec. 771, 776; *Morgan's Heirs* v. *Morgan,* 4 U.

S. Cond. 120 ; *Colson* v. *Thompson*, id. 143 ; *Barrs* v. *Lapsley et al.*, 3 id. 506 and note ; *King* v. *Hamilton*, 4 Pet. 311 ; *Milward* v. *Earl of Thanet*, 5 Ves. 720.

3. The property is charged with several successive trusts. And the court having taken charge of the administration thereof, ought to retain the case and continue the property in the hands of receivers, subject to the direction of the court for the protection and benefit of all parties in interest. Each party has a right to know how the property is managed and how the funds are disposed of, and this right can only be enforced in court.

It will be much better for the interest of all parties and more in accordance with the character of a court of equity to retain the control of the property and administer the trusts, than to turn the parties out of court, for the sake of having a new bill brought solely for the administration of the trust. When a court enters upon the administration of a trust it should continue until it is fully administered or the parties all agree amongst themselves.

4. The cost of the Vermont and Canada railroad.

The cost of the road as found by the masters upon which rent should be computed is $1,251,227 73, and we insist that is the proper sum, and upon this basis no rent was due to the orator at the time of bringing this suit.

It is true, as claimed by the orator, that rent was paid upon the full amount of the capital stock of the Vermont and Canada Railroad Company, as the cost of the road, and it is not denied but that is evidence tending to show an agreement or understanding of those who made the payments that the stock represented the cost of the road.

But in this case the payments were made by agents and trustees, and are not entitled to the same force as in cases of such payments by individuals in their own behalf.

And as the evidence shows that some portion of the capital stock was expended for other purposes than the cost of the road, the case was properly referred to masters to ascertain the cost, and their report upon this matter is final unless they have received or excluded testimony wrongfully. The weight of the circumstances of payment upon the capital stock was to be judged of by them.

5. Incidental expenses.

We insist that the defendants are not bound to pay these. The incidental expenses referred to in the lease and explained in the contract of July 9, 1850, are those expenses incident to operating the road and not the expenses which the orator may see fit to incur, for its own convenience.

Its expenses for keeping up its organization and making reports to the legislature and its legal expenses by way of advice and the prosecution of its claims and defence of suits, are not chargeable to the defendants under the lease. The orator covenants to keep up its organization and make all reports required by law, and this implies that it is to be done at the orator's expense.

The defendants are not bound to fight all the orator's battles under the lease.

6. If there was no breach when this suit was brought, then the non-payment of rent *pendente lite* is no ground for substantive relief under the bill, and most certainly furnishes no ground for ordering the property into the possession of the orator. Since the bill was brought, the property has been in the hands of the court, and beyond the power of the defendants, by the act of the orator.

It would be an anomaly in equity jurisprudence, if the orator could deprive the defendant by injunction and the appointment of a receiver, of the power to perform the conditions of a contract, which until then was not broken, and thus cause a breach for the purpose of sustaining his bill.

It is clear that there was nothing in arrear at the time this suit was brought, upon the basis of the cost of the road, upon which rent is to be computed, as reported by the masters.

The rent had been overpaid at that time.

This, at all events, would be a conclusive answer to the prayer for possession, and a reason why the custody of the property should be retained by the court for the administration of the trust.

The decree of the chancellor ought, therefore, to be affirmed.

*Ira Perley* and *John M. Pinkerton*, for the defendant Sohier.

I. The lease of August 24, 1849, was never a valid contract, and binding upon the parties,—certainly never upon the Vermont Central company.

Vermont and Canada R. R. Co. v. Vermont Central R. R. Co. et al.

1. The charters of these corporations, as originally passed, never authorized any such agreement. 2 Cranch 128, *Head et al.* v. *Providence Ins. Co.* ; 4 Wheat. 636, *Dartmouth College* v. *Woodward* ; 12 Wheat. 64, *Bank of U. S.* v. *Danbridge;* 5 Pet. 152, *Beaty* v. *Fowler;* 13 Pet. 587, *Bank of Augusta* v. *Earle* ; 9 How. 172, *Perrine* v. *Chesapeake & Del. Canal*; 27 Pennsyl. 339, 351, *Commonwealth* v. *Erie & N. E. R. Co.;* 27 Vt. 141, *Thorpe* v. *Rut & B. R. Co.;* 31 Vt. 218–19, *Branin* v. *Conn. & Pas. Rivers R. Co.*

Such a contract is illegal and void, and cannot be enforced. 6 Eng. L. & Eq. 106, *Berman* v. *Bufford;* (See opinion of the court on pages 110, 111.) 13 Eng. L. & Eq. 359, *Simpson* v. *Denman;* 21 How. 442, *Pearse* v. *Peru & Indianapolis R. Co.* and *Madison & Ind. R. Co.*

Such must be the law in Vermont, or else there would have been no occasion for the act of Nov. 6th, 1847, or the act of 1849.

2. Did the act of 1847 confer upon the Vermont Central company authority to enter into the arrangement with complainants, contained in the lease ?

The charter of the Vermont Central company was granted Oct. 31, 1843 ; no power was reserved therein by the legislature to alter or amend it. Therefore, no material alteration could be made without the assent of the stockholders, — not of a majority, but of every individual stockholder therein, — because this matter of increasing the powers of the corporation is not within the scope of, or in obedience to, the provisions of its original constitution.

Beyond the limits of the act of incorporation the will of a majority cannot make an act valid. A. & A. on Cor. 469, (Ed. of 1858) ; 1 N. H. 47–8, *Union Locks and Canals* v. *Towne* ; A. & A. on Cor. 599, sec. 537, &c ; 1 Stockton 401, *Kean* v. *Johnson et al.*; 19 Eng. L. & Eq. 350, *Clay* v. *Bufford;* 3 Maule & S. 448, *Davis* v. *Hawkins;* 4 John Ch. 573, *Livingstone* v. *Lynch;* 5 Hill 386, *Hartford & N. H. R. Co.* v. *Croswell* ; 18 Barb. 312, *Macedon & Bristol Plank Road Co.* v. *Lapham;* 29 Vt. 545, *Stevens* v. *Rut. & B. R. Co.;* 12 Beav. 377, *Solomons* v. *Lang;* 6 Railway Cas. 301, same case.

At the meeting of Aug. 15, 1849, when an attempt was made to have the act of 1847 accepted, neither a majority of stockholders or stock were present or represented.

The meeting was not properly called so as to be authorized to act upon the question of the acceptance of this act. It was a special meeting. There was not anything in the call relating to the act of 1847, or that indicated that the question of its acceptance would come before the meeting for consideration.

In cases of special meetings of a corporation, when the business is unusual or important, it is indispensable that the call for the meeting should state the business to be transacted; if not so stated, the doings of the meeting will be illegal and void. Red. on Rail. 16, sec. 21, paragraph 3 and note; A. & A. on Cor. 560–1; 2 Burr. 735, *Rex* v. *Town of Liverpool;* 2 Burr. 744, *Rex* v. *Town of Doncaster.*

3. On August 24, 1849, the railroad of the Vermont and Canada company had not been commenced; the stock had not been subscribed for or otherwise taken up. The arrangement, on that day concluded, was made to enable the Vermont Central company to raise money to build the railroad of the Vermont and Canada company, and is not such a lease as was contemplated and authorized by the act of 1847.

II. 1. The agreement of July 9, 1850, which the complainants now seek to have enforced, was never of any binding force upon the Vermont Central company, and cannot be sustained.

1st. Because there was nothing in the *charter of the company,* nor in the *act of* 1847, which authorized this contract.

2d. Because this contract, in the nature of a mortgage by one railroad company of its road to another, was *without consideration,* and *not in furtherance of building* the Central road, or of *paying the debts* contracted therefor.

Railroad corporations may sell or mortgage their personal property, but they cannot sell or mortgage with it the road, nor any other corporate right or franchise, without the authority of the legislature. *Hall* v. *Sullivan R. Co.*, Red. on Rail. 579,

and the authorities there cited; 19 Eng. L. &. Eq. 514, *South Yorkshire R. Co.* v. *Great Northern R. Co.;* 32 N. H. 538, *Pearce et al.* v. *Emery et al.;* 9 Hare 305, *Great Northern R. Co.* v. *Eastern Counties R. Co.;* 12 Eng. L. & Eq. 224, same case; 21 Eng. L. & Eq. 319, 329, *Shrewsbury &c., R. Co.* v. *London, &c., R. Co.;* 19 Eng. L. & Eq. 584, *Johnson* v. *Shrewsbury, &c., R. Co.;* 13 Eng. L. & Eq. 506, *Winch* v. *Birkenhead, &c., R. Co.;* 21 How. 442, *Pearse* v. *Mad. & Ind. R. Co. and Peru & Ind. R. Co.*; 6 Eng. L. & Eq. 106, *Beman* v. *Bufford*; 13 Eng. L. & Eq. 359, *Simpson* v. *Denman;* 7 Eng. L. & Eq. 505, *East Anglian R. Co.* v. *Eastern Counties R. Co.;* 16 Eng. L. &. Eq. 180, *McGregor* v. *Deal and Dover R. Co.;* 30 Eng. L. & Eq. 120, 144, *Norwich* v. *Norfolk R. Co.;* 8 Gill & John. 249, *Penn. Del. Md. Steam Nav. Co.* v. *Danbridge;* 3 Wood. & Minot 105, 112, *Sumner* v. *Many.*

The act of 1847 did not authorize the conveyance of July 9, 1850. It gave authority to corporations to make leases or contracts of that character, but no authority to convey their property and franchise absolutely or conditionally. Contracts of this character must be made strictly according to the authority conferred, or they are not binding. 49 Eng. L. & Eq. 350, *Clay* v. *Bufford;* 6 Clark & Finnelly 113, 136–7, *Shrewsbury, &c., R. Co.* v. *N. W. & S. Union R. & Canal Co.*

The charter constitutes the contract between the stockholders, by which they are to be bound in regard to the enterprise contemplated, and by it the whole funds of the Company must be appropriated to the purposes specified in the act of incorporation, and none other. This contract is protected by the tenth section of the Constitution of the United States from alteration by the legislature, without the consent of every party to it.

The agreement of July 9, 1850, contemplates the appropriation of the funds of the Vermont Central Company to an object entirely different from the stipulations and purposes of its charter. It makes a new contract between the parties, and consequently cannot be binding until it has received the assent of every stockholder. The burden of proof is on the complainants to show such assent. The case, so far from showing this assent, shows that the acts of the special meeting of stockholders, held

July 9, 1850, were illegal and void, for the reason that in the call for that meeting, the conveyance of July 9, 1850, was not named, (though perfected at the time the call was made,) nor referred to in such manner as to give any person any information that such an instrument would come before the meeting. The call was one that would certainly mislead, and was probably so intended. The notice says the meeting is called " for the purpose of acting on a lease of the Vermont and Canada Railroad and *other arrangements connected therewith.*" Who for one moment would have thought, that under this call it was intended to introduce a measure which would have the effect to take from the corporation all its property and franchise, and divert all its funds into a channel not contemplated by its charter, so effectually that neither the stockholders nor the then or subsequent creditors would derive any substantial benefit from that property or those funds? Yet such is the fact if this conveyance is sustained.

Complainants contend that the lease and mortgage conveyance have been ratified by the Vermont Central Company and its directors since their dates.

1. They had no power to ratify what they had no authority to make.

2. There are no acts or doings of the company or its directors, between July 9, 1850, and October 20, 1851, the date of the first mortgage, relating to the mortgage conveyance of the former date. No acts or doings after October 20, 1851, can affect the rights of the bondholders.

Again, complainants contend that the mortgages given to secure bondholders were made subject to the contracts between complainants and the Vermont Central Company. The rights of the bondholders cannot be affected by that clause, because the lease and mortgage conveyance must be held illegal and void for want of authority and power in one or both of the companies to make them,

Again, complainants contend that the trustees have recognized the existence and validity of these agreements. The contracts being illegal and void, no length of acquiescence or recognizance by the stockholders of the Vermont Central Company or by the

trustees for the bondholders, can give them validity. 7 Eng. L. and Eq. 505, *East Anglian R. Co.* v. *Eastern Counties R Co ;* 16 Eng. L. and Eq. 180, *McGregor* v. *Deal and Dover R. Co. ;* 30 Eng. L. and Eq. 120, 144, *Norwich* v. *Norfolk R. Co. ;* 18 Barb. 312, *Macedon Plank R. Co.* v. *Lapham ;* Red on Rail. 95.

III.   The Vermont and Canada Company ceased to exist by reason of its non-compliance with the provisions and requirements of the act of November 18, 1858.

The charter of the Vermont and Canada Company provides that in case the railroad is not completed within thirteen years from October 31, 1845, then the corporation *shall cease and the act of incorporation be void.* This time expired October 31, 1858, but was by several acts extended to November 20, 1858.   The act of November 18, 1858, extended the time four years, on the condition that the company did within nine months survey and locate that part of its line mentioned in the first section, and expend upon the construction thereof fifty thousand dollars ; and the act further provides that if the company fail to perform this condition, then the company could not take any benefit under the act.   The company did not perform this condition.   Another act of November 25, 1858, provides, in case the company fail to perform the condition above named, and its charter thereby became forfeit, the receivers should continue to operate the road under the directions of the chancellor until January 1, 1860, and that the act shall take effect only in the event of the forfeiture of the charter.

Here, then, the corporation came to an end.   It ended according to the terms of the act creating it.

The last mode in which a corporation may be dissolved is by the expiring of the period of its duration, limited by its charter or by general law ; upon dissolution in which mode all the consequences of dissolution in any other mode, such as forfeiture of property, extinguishment of debts, abatement of suits, &c., ensue, unless, as is usual, they are provided against.   Upon such a dissolution without previous provision, it is beyond the power of the legislature, by renewing the charter, to revive the debts and liabilities owing to the corporation.   A. & A. on Cor. 904, sec. 778, and authorities there cited ; A. & A. on Cor. 191, 874,

Vermont and Canada R. R. Co. *v.* Vermont Central R. R. Co., et al.

5th ed.; Grant on Cor. 303; 7 Leigh 154, *Rider* v. *Union Factory;* 2 Robinson 207, *May* v. *Bk. of N. Carolina;* 8 Watts & Serg. 207, *F. and M. Bk.* v. *Little;* 23 Maine 318, *Reed* v. *Frankfort Bk. ;* 26 Maine 335, *Whitman* v. *Cox;* 3 Story Cir. Ct. 658, *Greely* v. *Smith;* 17 Alabama 766, *Saltmarsh* v. *Bk. Mobile;* 13 Ohio 298, *Remick* v. *Bk. of West Union;* 2 Harrington 8, *Bank* v. *Lockwoods.*

IV. The legislative act of November 17, 1859, had the effect *to change the terms of the lease, or the rights of the parties under it.*

1. It imposes *duties,* upon the party who shall operate the road constructed under those acts, *different* from the duties existing in the charter at the time of the lease, and thereby relieved the Vermont Central company and its assigns from the performance of the covenants in the lease.

2. But there is another view to be taken of this point.

The grant, by the Vermont and Canada company, to the Vermont Central company, of the right to fix the tolls, fares, and rates of compensation, &c., and to use the railroad of the former, with its cars, engines, &c., in any way which it may from time to time elect, should be considered *as conditions precedent,* which must be continually fulfilled by the former, before the latter can be made liable for rent. The contract to pay rent is dependent on the contract that the lessee shall have the entire control of the entire thing leased, in the manner and for the purposes named in the lease; and this control being taken away, or materially abridged by the neglect, and with the assent of the lessor, the lessee can no longer be obliged to use the railroad, and pay the stipulated rent therefor. 2 Parsons on Cont. 39; 7 Adol. & Ellis 54, *Mechelln* v. *Wallace;* 11 Mees. & W. 480, *Combie* v. *Green;* 7 Barb. 618, 619, *Parmalee* v. *Os. and Syr. R. Co;* 15 Vt. 448, *Goodale* v. *Field.*

3. The conduct of the Vermont and Canada company in accepting the legislative acts of Vermont, with the burdens and conditions imposed, *amounts to an eviction of the Vermont Central company from the premises, which releases it from paying rent.* 1 Washburn on Real Property 342–3, and cases there cited.

Vermont and Canada R. R. Co. *v.* Vermont-Central R. R. Co. et al.

BARRETT, J. Under the lease of August 24th, 1849, and the addition thereto of July 9th, 1850, the orators, with the co-operation of the Vermont Central Railroad company, proceeded in the completion of their road from Essex Junction to Rouse's Point, and, upon such completion, the Vermont Central company took possession thereof, and, by themselves and the trustees under the first mortgage, with the incidental interposition of the court of chancery, have continued to possess and operate said road to the present time. The first and second mortgages were both made subject to the rights and duties provided and stipulated in said lease and the addition thereto. The bonds that were issued by the Vermont Central company were upon the security created by the said mortgages respectively, and the rights of the bondholders in reference to such security are created by, and derived through said mortgages.

The rent was paid to June, 1854. That falling due in December, 1854, remaining unpaid for more than four months, this bill was brought to enforce the security for the same, created by the indenture of July 9th, 1850, and was entered in the court of chancery for Franklin county, June Term, 1855. In the meantime no rent has been paid since that which fell due and was paid in June, 1854.

The Vermont Central company and the trustees under the first mortgage, in argument before this court, admit the legality and binding force of the lease of August 24th, 1849, and also of the indenture of July 9th, 1850, so far as it was designed, and may operate to give security upon the earnings of the roads for the payment of the stipulated rent. They object to possession of the roads and property being given to the orators under the last indenture, claiming that to that intent the contract is illegal and invalid. They also object to the claim as made by the orators in respect to the cost of construction, and to their claim for incidental expenses.

The second mortgage is not represented in this court. Mr. Sohier, a bondholder under the first mortgage, made answer to the bill, and appeared in the court of chancery, standing upon the bill, his answer and the proofs taken in the case, so

JANUARY TERM, 1861. 47

Vermont and Canada R. R. Co. v. Vermont Central R. R. Co. et al.

far as they were pertinent to the issues made by his answer. He is represented in this court by counsel, who in his behalf, and, through him, in behalf of some other bondholders, contest the rights claimed by the orators. A leading point made and urged by the learned counsel in the argument is, that the indentures of August 24, 1849, and of July 9th, 1850, are not valid, and never were binding on the Vermont Central company, by reason of being *ultra vires* of either corporation to make, though their validity is not put in issue on this ground by Mr. Sohier's answer.

Various other points are taken and urged, which will be considered, so far as may be necessary in deciding the case. Upon the point first named the contest is between the orators on the one hand, and Mr. Sohier as a bondholder, on the other, standing upon his rights to the security created and furnished by the first mortgage. The character of the question is such, in the relation that the parties to it sustain to each other and to the subject matter involved, that we have given it full consideration, irrespective of the defect in the record in this particular.

It is too late to question the doctrine that a corporation has only such powers as were conferred by the power that has created it. By the original acts of incorporation, neither of the parties were endowed with the power to enter into such contracts of lease and security as were made in this case. If this case was standing only upon the original acts of incorporation, they would be subject to impeachment for invalidity, in behalf of parties sustaining such a relation to either of the companies and to the contracts as to entitle them to question their validity.

In considering this subject as it is presented in the argument, a distinction is to be noted between the invalidity of a contract resulting from the want of capacity to make it, and that resulting from its being in violation of law, or contrary to public policy. If such contract is not in violation of some public law or contrary to public policy, it would seem that only the immediate parties to it, as the corporations themselves, or the stockholders, who are parties by representation, would hold such a legal position in relation to it, as to entitle them to raise the question of

validity on account of the want of capacity ; while on the other hand, if such contract was in violation of some public law, or against public policy, in such sense as to make it void and of no efficacy to any intent, any person standing in a relation of interest to the subject matter of the contract, and to be affected by its operation, might undoubtedly set up and insist on such fatal vice in it, for the purpose of clearing himself from the consequences of its being carried into effect.

Though the original acts of incorporation of the two railroad companies do not provide for such contracts as were made in this case, still they do not in terms prohibit them.   Whether it was or was not competent for the legislature, by subsequent general or special enactments, to vary in this respect the powers and capacity of the corporations, without their assent thereto, it certainly would not be *unlawful*, in the sense of being in violation of some public law, or contrary to public policy, as those terms are used in relation to such subjects, for the corporations to exercise any powers or rights conferred by such subsequent legislation. So far as one corporation, as an immediate party to a contract made in the exercise of such powers or rights, should, concurrently with the other party, assent to the legality of such contract, it is difficult to see upon what principle a party holding under such corporation, by virtue of a contract that expressly recognizes the existence of such prior contract, and the rights and duties thereby created, and in express subjection to them, can be permitted to impeach its validity and binding force.   As between the two corporations, both conceding and asserting the lawfulness of the contract to which they were parties, it would seem that no plausible pretext could be assigned why they might not have a sure standing in the courts for the enforcement of their respective rights created by such contracts.   Suppose, in the present case, that there had been no mortgage to secure the bonds issued by the Vermont Central company, who but the corporation, or its individual corporators, could have denied the validity of the lease, in defence to the enforcement of its provisions ?   And can a party who stands upon a security taken in express subjection to that lease and the rights and duties thereby created, stand

upon better ground than the one giving the security, so far as the question of the validity of the lease depends on the question of lawful capacity to make it?

The act of 1847, sec. 34, (Comp. Stat., chap. 26, sec. 66) provides in terms that " all railroads incorporated, or which may be incorporated under the authority of this State, shall have power to make contracts and arrangements with each other. * * for leasing and running their roads or any part thereof," etc.

This, in terms, does, and clearly in purpose was designed to, confer the powers named upon corporations then already existing. This of itself is conclusive upon the question of *public policy* in this respect, as well as upon the question of *lawfulness*, in the sense in which it has been thus far considered.

But however the above views may be regarded, there is another light in which the subject seems to stand upon clear ground.

It was competent for the corporations, by the unanimous consent of their stockholders, to accept such additional powers conferred by a general law, and exercise them with the same efficacy, to every intent, as if they had been conferred by the original act of incorporation. It is shown by the evidence that the corporations, did exercise these powers in making said contract of lease and security for the rent, and that, too, by the direct action of a stockholders' meeting, called and held for that purpose on the 9th of July, 1850. Such exercise of those powers is, in the absence of any averment or evidence to the contrary, sufficient ground for assuming that the corporations, as such, had accepted them as a part of their organic law; and particularly is this assumption well made, since no member of the corporations has ever interposed any protest or dissent. The ordinary rules of presumption require this, until the contrary is asserted by some party lawfully competent to make issue upon it, and who does make and maintain such issue in a mode and by means warranted by the law.

We are unable to assent to the criticism made as to the character of the notice of that meeting. It seems to us that it comprehensively indicates in substance the matters to be acted on, to the full extent of the action that was contemplated or taken. It does not seem adapted to mislead anybody interested and hav-

ing a right to participate in the action contemplated, nor do we discover in it, or in the circumstances and occasion, evidence of any sinister or improper intent on the part of those at whose instance the meeting was called. That no one of the stockholders was in fact misled by it, or dissents from the action there taken, is clearly evinced by the fact that no one has ever, by any from of proceeding, asserted any immunity against that action or the consequences flowing from it. Inasmuch as that meeting of the stockholders was properly called, and all had an opportunity to be present and act upon the subject of it, and as the vote of those present was without any dissenting voice, and as no one of them has since in any form objected to the action then had, it is to be taken and held, for the purposes of this case, that all the stockholders concurred in that action, and that they assent to its effect for all legitimate purposes touching the rights, either of the corporation or of themselves individually as members of such corporation ; Redf. on Railways 11 ; 11 Vt. 302, Ang. and A. on Corp., sec. 238, 1.

The ground on which it is held that an original charter that has been acted upon by the organization of the corporation under it, and by the investment of funds in its capital stock in pursuance of its provisions, and for the accomplishment of the prescribed purposes of its creation, cannot be materially altered, by subsequent legislation, so as to bind the corporation itself, or the individual corporators, without their assent respectively, is, that, as between the State and the corporation, the original charter becomes a contract mutually obligatory, and that, as between the corporation and the stockholders, it is matter of contract that the corporation shall administer the funds and exercise the functions according to the provisions, and in accomplishment of the purposes, prescribed by the charter. The stockholder has distinct individual rights as against the corporation, growing out of that relation, which he cannot be compelled to yield or forego without his assent. In this respect he is not subject to the will or vote of the majority. It is only as to matters within the prescribed limits of corporate power and capacity, that he, as a stockholder, becomes, on common principles, subject to the vote of the majority. Standing upon those rights and in the exercise thereof, he

may, at his pleasure, and effectually, assent to or dissent from measures adopted by corporate vote in the usual mode    But this is personal to himself alone, unless by privity of personal contract with him, another obtains this his personal right.    In the present case the bondholders stand in no relation of privity with the individual stockholders, in reference to the rights above referred to.    They hold their relation of interest in virtue of their contract with the *corporation* itself, evidenced by the bonds held by them, and the mortgage given by the corporation to secure them.    They came into that relation after the enactment of the general law conferring the enlarged powers in question upon railroad corporations, and after the exercise of those powers by said corporations in the making of the contracts of lease and security for rent, and in exp ess subjection to those contracts.

Those contracts, then, in relation to the bondholders, so far as their validity depends on the capacity of the corporations to make them, must stand upon the action of said corporations in exercising and adopting the additional powers conferred by the general law of 1847, in pursuance of which said contracts were made.

It seems proper in this connection to notice a point much and mainly urged in the argument of Judge PERLEY, viz : that the indentures are not what they purport,—*a lease* and security for *rent*; but are a pretext and cover under which, in point of fact, the Vermont Central Company went on and built, with its own funds and means, the Vermont and Canada Railroad, the same as if the latter company had not existed, the pretended taking of stock in that company being, in fact, a loan of money by the stockholders to the Vermont Central Company at a guaranteed interest of eight per cent.    This being assumed to be the true character of the transaction, then it is claimed and argued that this is beyond the powers conferred either by the original charter or by the general law of 1847.    It is, perhaps, true that the stockholders expected to get eight per cent. on their money invested in the purchase of stocks, and that the provisions for rent, according to the practice of the Vermont Central Company and the trustees, in the payments made by them under the lease, would substantially accord that to them.    But we fail to find

sufficient ground for sustaining the point thus made. The instruments themselves purport in their provisions to be a *lease* of a road then already chartered and located, with stipulations as to its being seasonably completed, and in a lawful and proper manner, all to be done with the money and means of the Vermont and Canada Company. The reason which induced the Vermont Central Company to enter into this arrangement cannot vary the true character of the transaction as it was consummated between the parties. It was important for the Vermont Central Company that the Vermont and Canada Road should be built. The latter company, as depending on the ultimate character and profitableness of the road as an independent enterprize, in the condition of the public mind then prevalent, as to railroad stocks and securities, found itself unable to dispose of its stock to a sufficient extent to realize the necessary means for constructing the road. In this condition of things, the Vermont Central Company deemed it advisable to propose, in a mode provided and authorized by law, to remove the cause for hesitating and declining to take the stock, by taking a lease of the Vermont and Canada Railroad, paying a rent therefor that would render the stock a safe and eligible investment, if the latter company would go on and make it. Being satisfied that, under such a contract of lease, it could proceed with the enterprize of making the road in reliance on the sale of the stock, as the ultimate source of means with which to do it, the Vermont and Canada Company entertained the proposition, and the indentures were accordingly made. That the means, thus raised, in fact disbursed the cost and expense of making the road is not denied. But it is claimed that all this was only a kind of machinery, by which the Vermont Central Company in fact had a *loan* of the stockholders of the Vermont and Canada Company of the amount of money thus raised, at an interest of eight per cent.

If this be so, it is noticeable as a peculiarity of *this* loan that there is no obligation or duty ever to pay the principal. It is also noticeable that the Vermont Central Company have no title or ownership of the road, depots, lands and appurtenances, except what is created by the indentures, and that is of a mere lease hold. It is particularly worthy of notice that all the stipulations

in the indentures, as well as all that has been done in pursuance of them, are as consistent with the character of *a lease* to be given to the transaction, as that of a *loan* of money to the Vermont Central Company. The fact that the Vermont Central Company advanced money for the current expenses to some extent, while the road was in process of construction, in reliance upon Vermont and Canada Company stock, and sold some of that stock at a discount as a mode of raising funds, does not, as matter of law, vary the character of the indentures. This could be regarded at most as a temporary advance or raising of money for the Vermont and Canada Company, under arrangements for the time being, to which only the stockholders of the Vermont Central Company would have the right to make objection, and that too at the time of the transaction, and would not fix or taint the character of the arrangement created and evidenced by the indentures. We see nothing in the case requiring, or that would warrant the court to give to the transaction the character imputed to it, or to hold it to be other than the indentures give to it—a *lease.*

*As to the indenture of July* 9, 1850. We are not sufficiently concurring to warrant us to decide that it should be held operative, so far as it purports to grant, sell and convey to the Vermont and Canada Railroad Company, its successors and assigns forever, the said Vermont Central Railroad, as now built and constructed, and all its lands, depots and easements, &c., with the right to enter or take possession of, and use and run, not only the Vermont and Canada, but also the Vermont Central, together with all lands, depots and other property, rights and privileges owned and enjoyed by each of said companies, and used in connection with, or for the purpose of running or working each of said railroads, as is specifically provided therein. So we refrain from any discussion of that feature of the instrument.

It is obvious that one leading purpose of the instrument was to make " reasonable security" to the Vermont and Canada Company for the payment of the stipulated rent. The question whether it was competent for the Vermont Central Company to contract for the pledge of " all tolls, fares, and other lawful income receivable for the use of said railroad," after paying the

expenses of running, and keeping in repair, and furnishing proper furniture, for the payment of the rent in arrear, runs clear of, and is distinct from, the question of the right of that Company to convey in mortgage its property, franchises, easements, and privileges, with the possession thereof.

The Vermont Central Company, and the trustees under the 1st mortgage, concede the right to make such a pledge, and admit the validity of the indenture of July 9th, 1850, as such pledge of the tolls, fares and income. Mr. Sohier avers nothing to the contrary in his answer. His counsel in the argument do not question the *right* in this particular and to this extent.

They question and deny the validity of the instrument as a conveyance in mortgage of the property, franchises, easements, and privileges, with the right of possession, as being *ultra vires*, and also for the reason that, if enforced in that respect, it would substantially transfer the railroad, and all the property, franchises and privileges of the Vermont Central Company to the orators, without consideration.

The argument, predicated upon the alleged want of consideration, would legitimately apply to the right of the orators to enforce the instrument in its feature of a pledge of the tolls, fares, and income, as well as to the other feature, viz: that of a conveyance in mortgage as before named. But it is to be noticed that Mr. Sohier, in his answer, does not aver any want of original consideration, as a ground of invalidity of either of said indentures, but insists that, by reason of the failure of the orators to do certain things required by their charter, and the act in amendment, of November 18, 1858, the Vermont Central Company has been, and is absolved from obligation to perform any of the covenants and agreements contained in said indentures; and that they have become void, and the orators have no rights under them; that the consideration for the making of them by the Vermont Central Company has wholly failed, from the acts and omissions of the orators; that the execution of said covenants and agreements has become impossible, through the aforesaid acts and omissions of the orators, and then specifies wherein; thus controverting the validity of both the instruments solely on the ground of matters accruing long after their execution and deliv-

ery, and in no manner on the ground of an original want of consideration.   In this state of the case, the duty is not incumbent upon the court to discuss or decide questions that are not brought in issue by the record.

Before discussing the questions raised upon the answer, as to the rights of the orators, as affected by the alleged *failure* of consideration, it seems proper to consider the point made by the answer, that by reason of non-compliance with the requirements of the 2d section of the act of November 18, 1858, the orators' charter is forfeited.   Whether forfeited or not depends on the effect to be given to the provision in the 2d section of the charter, and the subsequent legislation in respect thereto.   The language is, " If the company shall not, within five years, commence the construction of the road, and shall not within thirteen years, complete and put in operation said road connecting, &c., then this corporation shall cease, and this act be void."   The act of 1858 substituted a new section for that 2d section, giving the company further time, and prescribed more particularly the manner and conditions of the connection to be made in Burlington with the Rutland and Burlington Railroad, and providing that, unless the provisions of that act of 1858 should be complied with, the company should take no benefit from the act.

If those provisions were not complied with, then of course the matter stood the same as if that act had not been passed.   By an act of November 25th, 1858, it was provided, that, in case the company shall fail to comply with the provisions of said act of November 18, 1858, *and its charter shall thereby become forfeited,* it shall be lawful for the receivers and managers of said road to continue to operate it until January 1st, 1860, and until otherwise provided, under the direction of the chancellor, who may require such persons to give bonds, &c., "*Provided,* nothing in this act shall be construed to give effect to the same, only in the event of the forfeiture of the charter of said company."   It is claimed that, under these acts, the non-compliance with the 2d section of the charter, and of the amendment of it by the act of November 18, 1858, operated as a forfeiture, without the intervention of any proceedings in that behalf.

Whatever might be the legal consequences of such non-com-

pliance, we do not understand from this peculiar form of enactment that the legislature have undertaken to *declare* a forfeiture, but only to prescribe the consequences to flow from certain acts and omissions. Whether such acts and omissions had in fact occurred the legislature did not assume or design to determine. Whether they had occurred or not was left to be determined upon proofs to be adduced in a proper proceeding, to be instituted for the purpose of testing the question of forfeiture. It is beyond question, that, unless the legislature undertake to declare a forfeiture upon facts that have already occurred, it appertains to the judicial department of the government to determine whether such forfeiture has been incurred. When the act of the legislature only prescribes the elements which shall operate as a forfeiture, whether such elements exist or not is an open question, which the party, against whom they are alleged, has a right to contest before a judicial tribunal.

The provision in the act of November 25th, 1858, as to its being lawful for the receivers and managers of said road to continue to operate the same under the direction of the chancellor, is entirely consistent with this view, and was as necessary in case of a forfeiture declared by the court as by the legislature, until further provision should be made for the operation or disposition of said road after the taking of such forfeiture.

Again, the intention of the legislature on this point is quite clearly indicated by its further action on the subject in 1859, when, instead of either assuming or declaring that a forfeiture had occurred, they proceeded again to amend the 2d section of the charter by providing and prescribing further time, and other modes of completing the road into Burlington, and making connection with the Rutland and Burlington Railroad ; in failure to do which, the same language is used as in the original charter, and in the act of November 18, 1858, viz: "then this corporation shall cease, and the charter thereof be void"—language quite inappropriate, if, in the understanding and intention of the legislature, a forfeiture had been already taken by force of the prior action of the legislature on that subject. A forfeiture of a corporation can only be taken in behalf of the public, and by some form of proceeding to which the public, by proper representation,

is the party moving it, and in which, by competent authority, such forfeiture is declared.  On this general subject—see 11 Vt. 302 ; Angell and Ames on Corp., secs. 776–777, Redfield on Railways 603, (3.)  Inasmuch as the legislature have not, in this case, undertaken to declare such forfeiture, it is needless to discuss. whether, in such a case as this, it appertains to the legislative department of the government to take upon itself the exercise of such a prerogative.  Regarding the orators as a still existing corporation, under their charter and the laws of the state, it becomes unimportant to consider the arguments of counsel predicated upon the assumption of the extinction of the corporation by forfeiture.

Assuming, what is not controverted in the answer of Mr. Sohier, and is admitted by the Vermont Central Company, and the trustees under the first mortgage, that the indentures of August 24th, 1849, and of July 9th, 1850, are not affected with any want of original consideration, it is to be determined whether by what has occurred since their execution and delivery, the orators have lost their right under them to claim the rent and the security thereby stipulated and provided.

It is clear from those instruments, that it was the understanding and design of the parties, that the Vermont Central Company should pay rent at eight per cent. on the cost of such portions of the road as should be accepted by them in the manner provided therein.  The road was constructed and accepted accordingly from Essex Junction to Rouse's Point ; and thereupon the Vermont Central Company went into the possession and use of it as thus constructed, and by themselves, and assigns, have had the possession and use ever since.  This suit is instituted for the enforcement of the security for the payment of rent accrued and in arrear for the road as thus located, constructed and used, and that may accrue up to such time as all the rent in arrear shall have been paid, conformably to the provisions and stipulations of said instruments.  In the absence of any vice of illegality in the contracts under which the road has been thus used, and in the absence of any averment or evidence of fraud or bad faith towards the bondholders,.if the orators are to be precluded from

enforcing the security provided for the payment of the rent, it is to be by force of some stringent rule of law.

As to the neglect of the orators to build and complete their road so as to meet the Rutland and Burlington Railroad in the village of Burlington, and to connect the same with the Canada line in Highgate, within the time limited in the original act of incorporation, and in accordance with the covenants of the orators contained in said indentures, by reason of which it is claimed that the Vermont Central Company has become wholly absolved from all legal or equitable duty to perform any of the covenants in said indentures, and the same have become wholly void and inoperative :

It is obvious from the indentures taken together, and, particularly, from the last item of agreement in that of July 9, 1850, that the parties did not contemplate the building of the road other than from Essex Junction to Rouse's Point, unless, as matter of necessity, in order to save the corporate existence and rights of the Vermont and Canada Company, to an extent sufficient to enable the Vermont Central Company to enjoy the road under the lease. The substantial thing was the road from Essex Junction to Rouse's Point. If it should become necessary to build more, in order to a compliance with the law binding upon, and to be enforced against, the orators, then such additional road, when built, was to be the subject of rent, the same as that then already located and in the process of construction. In view of any evidence in the case, it is not pretended that the Vermont Central Company, or any party or interest in privity with it, has as yet suffered any detriment by the failure to locate and make the residue of the road within the prescribed time. The Vermont Central Company, and the trustees who appear in this court, are making no claim against the right of the orators to the rent, and the security therefor, on this account. Up to the present time the lease has yielded all the benefit to the lessees and their assigns, that was originally provided or designed by it. They have had all the use they expected or wanted, and all that they desire to have hereafter, as is clearly evinced by the circumstances and history of the matter, developed by the evidence

in the case. But it is said, that, by reason of the neglect to comply with the requirements of the 2d section of the charter, the orators, in order to save their existence, have been obliged to accept an amendment of their charter in this respect, which, when complied with, will put the Vermont Central Company in a position of disadvantage under the lease, as compared with that which they would have held, if the orators had complied with the requirements of the original charter; in fact, that it has become impossible for the orators to fulfill their undertakings in the instruments of lease. It is to be borne in mind that this bill was brought, and the whole proceeding has gone forward, with reference to enforcing payment of rent for the road, as it has thus far been located, constructed and occupied. The proceeding before the masters, and all the evidence bearing on the question of the sum for which rent is to be paid, has reference only to the road as already constructed and occupied. And any decree to be made in the case, under the present bill, in favor of the orators, must be predicated upon the cost of the road as it was at the time it was so completed as to be the subject of rent under the lease.

The Vermont Central Company, under the instruments of lease, are not to be called upon to pay rent for any other portion of the orators' road, till the same shall have been constructed and proffered for acceptance. Whether such further portion of the road shall be built or not is a matter to be settled between the orators and the state. When it shall have been built, and proffered for acceptance, and rent claimed therefor, the question may then properly be raised as to the obligation of the Vermont Central Company to accept the same, and pay rent therefor, depending upon the duties and liabilities with which the possession and use of it may be incumbered by virtue of additional legislation in that behalf, on account of the failure of the orators to comply with the requirements of the original charter.

The immediate duty to the public, under the charter and subsequent legislation in respect thereto, rests upon the orators. The Vermont Central Company has assumed to perform so much of that duty, and in such manner, and upon such terms and conditions, as are specified and stipulated in the instruments of lease.

Their duty in that respect is owing to the Vermont and Canada Company. It is matter of contract between them. The provisions for remaining duties to be performed by the Vermont and Canada Company towards the public are contained in the act of 1859. The time therein limited, upon the expiration of which the discharge of that duty to the public is to commence, has not yet expired : so of course, it cannot now be known, or determined, whether, at that time, the performance of that duty will be exacted in the manner and measure provided in that act, nor, if it should be so exacted, what will be the consequences of a failure to perform it. If it should be exacted in that manner and measure, the question might then arise whether, by the instruments of lease, the Vermont Central Company was under obligation to assume the performance of it in behalf of the orators. If it should be held not to be under such obligation, it would then rest with the orators to determine whether they themselves would undertake the performance of it, by means and measures of their own, or neglect to do it, and hazard the consequences. Whether, in this latter event, such consequences would follow as would affect the rights and liabilities of the parties under the instruments of lease, cannot now be forecast or assumed.

It would seem to be seasonable to determine that, when the case shall have arisen involving the question, with a feeling of reasonable assurance in the mean time, that the law will afford ample protection to all interests involved. In the present posture of the case, we are unable to say that there has been such a failure on the part of the orators to perform the undertakings in their part in the instruments of lease, or that, by means of a failure on their part to perform the requirements of the charter, and the amendments thereto, they are now in such a position of inability to perform said undertakings, as to preclude them from the right to enforce the payment of the rent which shall have accrued prior to the happening of those events which, it is claimed, should thus operate against them.

In this view, it is impossible for us to see how there has as yet been a failure of the consideration, upon which the Vermont Central Company undertook and covenanted to pay the rent stip-

ulated, and made provision for securing the payment thereof.

The most that the case furnishes ground for saying is, that there is some reason to fear that, in some respects, the orators may fail to make good their undertakings, which, in part, constituted the consideration upon which the Vermont Central Company agreed to pay the stipulated rent and made the security therefor.

In the absence of any evidence of bad faith or willful default on the part of the orators towards the lessees and their assigns, in the course taken by them in reference to the unperformed requirements of the second section of the charter, either original or as amended, and in view of the fact shown by the evidence, that both the Vermont Central Company, and the trustees under the first mortgage, have approbated the course thus taken, and by the fact that none of the bondholders have manifested any disapprobation till since the act of November 18, 1858, and in the absence of any prejudice that has as yet occurred to any interest of, or derived through, the lessees, by the course thus taken, and in the want of any sufficient ground for determining that any prejudice is destined hereafter to accrué therefrom, the inequity of holding the orators disentitled to enforce their security for the rent becomes very palpable, and particularly so, when it is considered that the lessees, and their assigns, have had the full use and benefit of the orators' road, located and constructed to the approbation and acceptance of the lessees, with the money and means furnished by the orators, in substance agreeably to the stipulation in the instruments of lease.

This view being satisfactory to the court in reference to the points made in the answer of the trustees and of Mr. Sohier, as to the effect of the acts and omissions of the orators, since the execution and delivery of said instruments, upon the right of the orators to the rent accrued, and the liability of the Vermont Central Company and assigns in reference thereto and the security provided therefor ; we regard it unimportant to discuss various points and views presented by the counsel for the orators, and particularly, as to the relation of the trustees and bondholders to each other, and how the bondholders should be affected by the acts of the trustees, in reference to the possession under the

mortgage and deed of surrender, and the use of the road, and the payments of rent made by them.

And, as before intimated, we do not feel called upon to discuss and decide many questions made in the argument by counsel for the respective parties, which are not raised by the issues made by the pleadings, by and in behalf of such parties.

Owing to the lack of concurrence before named, as to one feature of the instrument of July 9, 1850, many points made in the argument are not properly debatable on this occasion.

Under the view in which the court do concur, in relation to that instrument, the case stands, not upon the ground of a bill to enforce a *specific performance*, as was claimed in respect of the feature of it which calls for the enforcement of that instrument as a grant, sale, and transfer in mortgage of the road, property, franchises and privileges of the Vermont Central Company with the right of possession ; but upon the ground of a pledge and lien by way of security, and as a means of obtaining payment of the rents in arrear, upon the earnings and income of the two roads, with the right to have them applied for that purpose, in priority to the other creditors of the Vermont Central Company, who became such, and took their security, in subjection to such pledge and lien of the orators.

This being a pledge and lien by way of security, which, it is not denied, the Vermont Central Company was competent to give, and the orators to take, the principles and rules, governing the enforcement of it, are less specific and rigid than those governing the class of cases which, in equity law, fall under the head of *bills for specific performance.*

In pursuance of the views thus presented, we hold the indenture of August 24, 1849, to be a valid instrument, between the parties, and that of July 9, 1850, to be valid as constituting a pledge, and lien, by way of security, for the payment of the stipulated rent, upon the tolls, fares and incomes of the two roads, in priority to the trustees and bondholders, and that the same is enforceable for the rents in arrear of the road as already constructed and used.

As to the sum on which eight per cent., as rent, is to be computed :

If it was now presented as an open question, in no way affected by the conduct of the parties, we should be inclined to construe the provisions in respect to rent, as contemplating the cost of construction, &c., to be measured by the actual outlay of money directly for those particular purposes. It was incumbent on the orators by the terms of the contract to furnish the means, and construct the road, and furnish depots, &c. This was to be done on their part, in order to produce the subject matter wherefor the stipulated rent was to be paid. The language of the stipulation to pay as rent therefor, " a sum equal to eight per cent. upon the amount of the whole cost, for the time being, of said road, its buildings, fixtures, lands and appurtenances, as the same shall have been paid by the Vermont and Canada Railroad Company," in its first and most natural impression, would seem to have reference to the money expended for those things, in payment for the making and purchase of them. But it seems that the immediate parties to the contract understood that a different measure of that cost was to be adopted, and, in fact, was adopted, and acted upon by them, and by the trustees in possession, down to and including the payment of rent made in June, 1854. The view which seems to have been taken was, that as all the funds of the orators were devoted, directly or incidentally, to the accomplishment of the ultimate purpose of providing the road for the acceptance and use of the Vermont Central Company as the subject matter of the lease, the funds so devoted were regarded and treated as the cost of construction, &c., and this was represented and measured by the capital stock paid in, with the addition of interest computed on the expenditures from the time they were made, in pursuance of the provisions of the contracts of lease.

However singular it may appear, that the Vermont Central Company should make the contract with this view of what was to be deemed the cost upon which the rent was to be computed, the evidence, and particularly that furnished by the acts of that company, as shown by various reports of their officers, and by accounts investigated and stated, and most emphatically, by the payments of rent computed upon that basis, renders it free of doubt that the respective companies, acting through their author-

ized officers, did understand and mean, in making the contracts, that such was, and was to be treated as, the cost upon which the computation of the rent was to be made.

Where the language of a contract is not explicit and incapable of but a single meaning and application in reference to the subject matter of it, what was the particular meaning and application which the parties mutually intended is open to inquiry upon evidence pertinent thereto. And the acts of the parties themselves, in carrying out the stipulations of the contract, and, particularly, the acts of a party in assuming the burdens imposed on him, to the most onerous extent of which the language of the contract is capable, are evidence of the most convincing character as to what their meaning was by the language used. When their meaning in this respect is determined upon evidence, in aid of the written instrument, that instrument, with that meaning, is the contract between them, and is effective to the same intents between them, and all in privity with them, or to be affected by it, as if that meaning had been expressed in unequivocal words in the instrument itself; unless, as to persons other than the parties, it should appear that it would be inequitable or unjust in the party claiming under and by force of the contract, in respect to or against them, to enforce it according to the true meaning and intent of the original parties to it.

In the present case it would not be enough, in order for the bondholders to avoid the effect of the contract as understood and acted upon by the two companies, to show, that, as between themselves and the Vermont Central Company, it would be prejudicial and unjust to them to give the contract that effect. They must go further, and show that it would be inequitable and unjust on the part of the Vermont and Canada Company, as against them, to have such effect given to it. The books furnish ample authority and illustration in this respect.

With a strong inclination to avoid such effect to the contracts in question, in the particular now under consideration, we have sought in vain for any evidence showing grounds for impugning the right, the justice, or the equity, in the orators to have the contract enforced against the trustees and bondholders according to its meaning and intent, as understood by the parties who made

it. Indeed the counsel for the trustees do not controvert these views, but, on this subject, confine the argument to the point that the evidence is not sufficient to show the meaning of the parties to have been what the orators now claim. Nor do the counsel for Mr. Sohier controvert them, but, on this subject, confine the argument to showing that various items of cost of construction, claimed by the orators in the accounting before the masters, were properly disallowed, and to showing that, in the rent account as made up and allowed by the masters, interest on the rent in arrear ought not to be allowed. Under the view we take, as to the basis on which the rent is to be computed, the former of said topics of argument requires no consideration. As to the latter, though the question of the allowance of interest does not arise in the precise form and connection contemplated by counsel in the argument, still the point taken is equally applicable under the view we take of the case as to the basis of computing the rent.

It is well settled in this State that if the contract is silent on the subject of interest, and does not by implication exclude it, on money due and payable under the contract, the law implies that interest is to be paid from the time it becomes payable and should have been paid; *Porter et al.* v. *Munger*, 22 Vt. 191; *Wood* v. *Smith*, 24 Vt. 606; *Gleason* v. *Briggs*, 28 Vt. 135.

As to the claim that there should be added as cost of construction the sum of thirty-two thousand six hundred and seventy-two dollars and fifteen cents:

The history of that claim, as developed in the case, shows that it was a very proper subject of investigation before the masters. It is well understood, that, unless the result at which the masters arrive in taking an account is clearly shown to be wrong, the court will not disturb such result. The reasons for disallowing this claim are very clearly stated on the seventeenth and eighteenth pages of their report, appended to the printed case, and they are cogent. As against the reasons upon which they disallowed it, the alternative of its allowance by the chancellor is submitted by them as resting upon the agreement of the parties in April, 1857. That agreement may be well and effective between the two corporations; but since the trustees and bond-

holders had long before that time supplanted the Vermont Central
Company in the immediate interest to be affected by the allow-
ance of that claim, it would transcend any principle of law with
which we are acquainted to give that settlement the effect sug-
gested, and especially so, in view of the facts reported, touching
the origin and character of the claim, and the mode of adjusting
it between the two corporations.   For the conditions and details
of that adjustment, the masters refer to the testimony of Levi
Underwood and John G. Smith, taken in the case before them
and (as they say) attached to the report; but it fails of being so
attached, and is not contained in the case as it is made up and
furnished to the court.   Probably it was not contemplated that
the court should revise the finding of the masters, upon the
evidence that was adduced before them, and upon which they
came to their result in this particular ; but that, by the effect to
be given to the settlement, and to what had transpired between
the parties, as shown by the documentary evidence, and to the
averment of claims in the answers of the Vermont Central Com-
pany and the trustees, the court should be asked to hold that this
claim ought to be allowed, notwithstanding the finding of the
masters as to the true relation of it to the actual cost of con-
struction.   Without discussing the topic further, it is sufficient
to say that we are unable to yield assent to the allowance of the
claim.   If it is not cost of construction, then it ought not to be
allowed.   The masters have failed to find it to be such, upon a
thorough investigation, and have disallowed it.   We have not
sufficient evidence before us to warrant us in saying that the
masters came to a wrong result.

Incidental expenses.

The bill is brought to enforce the security provided by the
instrument of July 9th, 1850.   The original lease of August 24th,
1849, made no provision in this respect.   The rights and duties
of the parties to it rested only in the covenants it contained.
Only in this latter instrument is anything provided or agreed as
to *incidental expenses*.   The first named instrument alone provides
for security, and it specifically states what such security is for.
By way of removing all ground of doubt as to the meaning of
the parties in reference to the payment of the stipulated rent, it

specifies precisely what they did mean.   In the same instrument they make provision for the security now sought to be enforced ; and it is security for *rent* only.   The subject of the incidental expenses, which is provided for in connection with the rent in the original lease, is not mentioned, nor in any way connected with the rent, in the provision for the security in the instrument of July 9th, 1850.   The orators under their bill seek to establish a priority of right over subsequent incumbrancers.   Settled principles of law require them to stand upon the legitimate force of the contract creating the security.   Aside from that contract, there is no ground for asserting the right to the priority which they claim. Whether as against the Vermont Central Company the provisions of the lease might not bind it to the payment of the incidental expenses, or whether, if the bill had been properly framed, a decree might not be made against that company for the incidental expenses, as well as the rents, it is of no importance to inquire. There is no ground in the contract providing for the security, nor in the bill as framed, for a decree against the trustees and bond-holders, that shall embrace the incidental expenses, and put them on the same footing as the *rent* specified and stipulated in the instruments of lease.

The question of a right to enforce the security, in priority to the rights of subsequent incumbrances, stands on a different ground from the question whether the trustees might not be subjected to the covenants in the original lease.   The bill is not framed with any aspect involving that question, nor with any aspect beyond the enforcement of the security for the *rent, eo nomine*, which is provided in the instrument of July 9th, 1850.

Upon the whole case we hold that the sum on which, as cost of construction, the eight per cent. is to be computed as the measure of the rent to which the orators are entitled, is one million three hundred and forty-eight thousand five hundred dollars, and that for that rent alone was security provided in and by the indenture of July 9th, 1850, and only in respect to that are the orators entitled to a decree.

In the present posture of the case, the court being unable to decide that the orators are entitled to the possession of the roads, property, etc., it seems obvious, in view of the character of the

property and of the various interests involved, that the only proper or practicable course is to have the roads and property remain in the hands of receivers, under the control of the court of chancery. A mandate will be drawn in detail according to these views and points of decision, and sent to that court.

The decree of the court of chancery is reversed, the orators to recover their costs, and the case is remanded to that court, to be there proceeded with conformably to the mandate aforenamed.