(43 South. 40.)

No. 16,461.

McGOWAN v. CITY OF NEW ORLEANS.

(Feb. 4, 1907.)

Assignments—Unearned Salary of Public Officer.

The assignment of the unearned part of his salary by a public officer is against public policy and void.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 4, Assignments, § 23.]

(Syllabus by the Court.)

Case Certified from Court of Appeal, Parish of Orleans.

Action by James McGowan against the city of New Orleans. Case certified by the Court of Appeal. Question answered in affirmative.

Thomas Donovan Flynn, for plaintiff. St. Clair Adams, Asst. City Atty., for defendant.

PROVOSTY, J. The Court of Appeal for the parish of Orleans has certified to this court the following question:

"Is the assignment of unearned salary by a public officer against public policy, and, therefore, void?"

In a recent case (First Nat. Bank v. State [decided in 1903] 68 Neb. 482, 94 N. W. 633, 4 A. & E. Ann. Cas. 423) the Supreme Court of Nebraska had occasion to say that it would be difficult to find a proposition more thoroughly established in the Reports than that the assignment of the salary or fees of a public officer, to be earned in the future, is contrary to public policy and void.

There can be no doubt of the correctness of the above statement. See 4 Cyc. 19; 12 A. & E. E. of L. 1033; Bliss v. Lawrence, 58 N. Y. 442, 17 Am. Rep. 273; State v. Williamson, 118 Mo. 146, 23 S. W. 1054, 21 L. R. A. 827, 40 Am. St. Rep. 358; Beal v. McVicker, 8 Mo. App. 202; Schwenk v. Wyckoff, 46 N. J. Eq. 560, 20 Atl. 259, 9 L. R. A. 221, 19 Am. St. Rep. 438; Field v. Chipley, 79 Ky. 260, 42 Am. Rep. 215; Bangs v. Dunn, 66 Cal. 72, 4 Pac. 963; Schloss v. Hewlett, 81 Ala. 266, 1 South. 263.

The reason of the rule is that, if the unearned salary of one day or one month may be assigned, that of the officer's entire term may in like manner be assigned, and thus the officer deprived of the means provided for his support, and thereby the public service be impaired. This reason operates as strongly in this state as elsewhere, and therefore the rule must be the same here as elsewhere.

Our Brethren of the Court of Appeal have given a synopsis of the argument in support of the negative of the proposition; which we transcribe here verbatim. It is as follows:

"For the Negative:

"The decisions of the English and federal courts can have no bearing on this argument; the English and the federal government being governed by statutes prohibiting such transfers.

"The same is true in many states. But it must be conceded that in many states where there are no statutes on the subject the assignment of a public officer's salary has been held to be void. These decisions form the only authority available to counsel, but they cannot affect the discussion of this case, because they do not apply to the legal conditions in this state. They will serve only one purpose, and that is to prove that the recognition of such assignments would be hurtful to the public

service. They hold that fact to be sufficient reason for annulling such transfers in those states, but in no wise affect the real issue here, namely, whether or not such assignments are recognized by law in Louisiana.

"The Law in Louisiana:

"In this state the whole subject comes under the terms of the written law (article 2449, Civ. Code), which reads as follows: 'Not only corporeal objects, such as movables and immovables, live stock and produce, may be sold, but also incorporeal things, such as a debt, an inheritance, a servitude or any other right.' In the first place the doctrine of public policy finds recognition in that provision of our law which makes natural law and equity the rule of decision where positive law is silent. In the absence of express enactment, or where the legislative expression is ambiguous, public policy, like any other consideration, may well control the determination of the judicial mind. But where the law is written down, and its terms are clear and unmistakable, they cannot be in any manner altered by the judicial notion as to what might be better for the public good. If that written law recognizes no exceptions, then the tribunal charged with its interpretation cannot in any interest, public or private, construe exceptions into it. Particularly is this the case where the doctrine of public policy urged is one resting, not upon any reprobation of any immoral practices, but simply upon a regulation for the efficiency of the public service; for the assignment of an officer's salary is not an immoral thing, but simply likely, if generally permitted, to impair the efficiency of the public administration.

"This unmistakable language, calling for no construction, our law makes incorporeal things assignable (article 2449). The provision is particular. It mentions a debt, an inheritance, or any other right. All of these things are thus invested in the quality of assignability, and the investiture is written. Are these exceptions? If so, where shall we look for them? Surely in the written law. It will not be contended that to an arbitrary law any other than an arbitrary exception will be recognized. It might with some reason be urged that an ordinary law couched in general terms might well exclude some acts of generally recognized turpitude. But no mere considerations of administrative efficiency can be accepted to limit or control the unambiguous terms of a written law. That law says a debt may be sold—a right may be sold. If there be any sort of debt or right which cannot be sold, then the exception must be sought somewhere in the written law.

"If the salaries of private persons are assignable, if the earned salaries of public officers are salable, is not the authority for that transferability to be found in that article? But what is there in the terms of this article which, while including the earned, excludes the unearned, salaries of public officers? Exceptions to this

article of the Code may be found throughout our laws, but nowhere is to be found a single word to support the exception contended for by counsel.

"The inference drawn by counsel from the exemption of public salaries from seizure is unfortunate, for it furnishes a striking and parallel instance of the necessity of a statutory exception to a statutory rule. Judgment creditors are given the right to seize the defendant's goods; but certain exceptions have been made by statute, nor would the courts think of recognizing any exception or enforcing any exemption to the citizen's statutory right of seizure, unless such exception were statutory. That is why the exemptions from seizure in this state have been embodied in the Code. And that is why the failure to embody the exception now being urged to the law of assignments in the Code or anywhere else in our written law emphasizes the proposition that such an exception has no legal existence.

"In considering the decisions of other states on this subject, the court must recognize the essentially different attitude of the common and civil laws towards the assignability of incorporeal things. Under the common law no choses in action were assignable. All such transfers were against public policy. In view of this fact, the importance attached by counsel to decisions in states where the assignability of public salaries has not been touched by statutes loses much of its weight, and acquires a wholly different significance. Statutes could not make them less assignable than they were before; and it is the very absence of the statutes on the subject that renders such decisions necessary. But the doctrine of nonassignability in the domain of incorporeal property has never had any existence in our law. As early as 1698 we found Domat (section 1772) recognizing assignments of debts. The Louisiana Code of 1808 (title 6, c. 2, arts. 16, 17) contain the same provisions on the subject in precisely the same language as our Code of to day (article 2449). Thus our law and the system from which it is derived recognized the assignability of incorporeal things centuries before the common law dreamed of such a thing. Thus, at the common law, before a particular chose in action can be treated as assignable, some special authority must be taken therefor. But under our law, where all choses in action are assignable, some special authority must be produced before any particular one can be robbed of that quality. When our Code was adopted, the assignment of public salaries was void at the common law, because all assignments were void. The doctrine in the form in which it is now urged was unknown. The Code cannot, therefore, be supposed to contemplate any such exception to its provisions.

"'Public policy' is only another term for the well-known legal expression, the 'policy of law.' Lord Brougham in Egerton v. Brownlow, 4 H. L. Cas. 1; Greenhood on Public Policy, p. 2. And how is the 'policy of the law' to be more satisfactorily established than by the

lawmaking power acting within the limits of the Constitution?

" 'As a general rule,' said Howe, J., in a decision expressly recognizing a judicial application of the doctrine (Kellogg v. Larkin, 3 Pin. [Wis.] 123, 56 Am. Dec. 164), 'the immediate representation of the people in Legislature assembled would seem to be the fairest exponent of what public policy requires.'

"The same question was presented to another court, for which it was contended that a railroad company's attempt to lease its road to another company was against public policy. But the right to do the acts complained of had been conferred generally upon corporations by statute. 'This of itself,' said the court, 'is conclusive upon the question of public policy in this respect.' Vermont & Canada R. Co. v. Vermont Central R. Co., 34 Vt. 1.

"And in Greenhood on Public Policy the principle is laid down that, where there is a statute governing any subject, it is of itself conclusive upon the question of public policy.

"The public policy of the state is that regulation to which the state, in the exercise of its police power, may subject for the general good the relations between its citizens. And the police power of the state resides in the Legislature, so that, when it speaks, its voice, within constitutional limits, is final. Mugler v. Kansas, 123 U. S. 623, 8 Sup. Ct. 273, 31 L. Ed. 205.

"In L. & N. R. R. Co. v. Kentucky, 161 U. S. 677, 16 Sup. Ct. 714, 40 L. Ed. 849, the United States Supreme Court held that the regulation of public policy is within the police power of the state, subject to legislative control, in the exercise of which the Legislature is vested with a large discretion beyond the reach of judicial inquiry.

"It may therefore be safely assumed that, if our Legislature were to pass a law permitting in special terms the assignment of unearned salaries of public officers, such assignments would be valid, and no longer against public policy.

"Has the Legislature permitted the assignment of the unearned salary of public officers? Article 2449 of the Civil Code authorizes the assignment of any incorporeal right; and, as such salaries are incorporeal rights, this article unmistakably authorizes their assignment. As the efficiency of the public service will not be sufficient grounds for judicially ignoring a written law, so it will not warrant the courts in establishing exceptions to rules, general, unconditional, and without exception, in the written law.

"Articles 1893 and 1895 of the Civil Code provide as follows:

" 'Art. 1893. An obligation without a cause or with a false or unlawful cause can have no effect.'

" 'Art. 1895. The cause is unlawful, when it is forbidden law, when it is contra bonos mores (contrary to moral conduct), or to public order.'

"These articles, it is contended, make all contracts contrary to good morals and public order invalid.

"In considering, therefore, whether the condition of any particular contract be against public policy, we must follow the usual guides to determine what public policy is.

"We must first see if the thing be permitted by the written law. If not, then we may enquire into the extent of its hurtful public tendencies. And, glancing through our Code, we find the general authority for the sale of any incorporeal right, and here the written authority being clear, we need search no further; for, as before shown, that which is permitted by the written law cannot be held to be against public policy.

"Such is the 'policy of the law' respecting the sale of incorporeal things, and the codal sanction given such sales will not be found respecting all contracts. Persons are not authorized to make any contract. They are simply endowed by the Code with the capacity to contract. And, if the contract be against public good, it may be set aside, unless, as in the case of sales of incorporeal things, it is especially permitted.

"We are admonished to read article 1895 and article 2448 together, and that there the former writes an exception into the latter. But this is not true. Article 1895 writes an exception in the general law respecting contracts in general, and would unquestionably, therefore, affect contracts for the sale of incorporeal things, if there were not in the Code a counter provision specially authorizing the sale of 'any' such right.

"Where an act is not malum in se or malum prohibitum, public policy is different in different places, different times, and with different people.

"At one time lotteries were not against the public policy in this state, though opposed to the policy of the federal government. The Louisiana Lottery Company held a state charter, yet was forbidden the use of the mails by Congress.

"Such matters should be left to the Legislature, and not made the object of judicial pronouncement.

"The Civil Code recognizes the right to assign future earnings and makes no exceptions as to salaries of public officers. Civ. Code, art. 1893, has no application to the matter at issue. It merely states than an obligation with a false or unlawful cause has no effect, and does not, directly or indirectly, refer to the question of public policy."

We agree with the view that article 1895 writes an exception into article 2448, and that assignments of incorporeal rights are void when against the public policy, and that the assignment of the unearned salary of an officer is against public policy. Article 2449 is much less sweeping in its terms than arti-

cle 2315. The latter article reads, "Every act whatever of man," etc.; and yet to the rule of the latter article there are well-recognized exceptions, which would be sought for in vain in our statutory law. Hubgh v. Carrollton Railroad, 6 La. Ann. 495, and other cases.

The principle upon which a salary is paid to an officer is not that of a contract, or that of the laborer being worthy of his hire; for the citizen owes his services free to the state in the proportion in which the state stands in need of them. But it is that the man must live, and that, if service is expected of him, he must be supplied with the means of livelihood. The law which prescribes the mode and manner in which the officer shall be thus supplied is one beyond the control of the officer, which is not within his power to nullify by private contract with one of his fellows. To illustrate the situation by a homely and somewhat exaggerated comparison: As well might one workhorse bargain away his daily allowance of oats, and then starve in the service of his owner, as an officer bargain away the means furnished for his support. The reason for allowing the salary is precisely the same which prompts the owner of the horse to furnish him daily with an allowance of oats. In both cases the sole end in view is the efficiency of the service. To deal with the matter as if the officer had a contractual right which he may bargain away is simply to misconceive the situation. The public in its own interest makes a certain regulation, and the officer is powerless to change it.

We will add that it was only in 1890, and as a result of an agitation in this state, that Congress forbade the use of the mails to lotteries, and that 11 years previously the Constitution of this state had declared gambling to be a vice, and enjoined upon the Legislature to pass laws for its suppression, and had fixed a date for the termination of the charter of the lottery company then operating in this state.

We answer the question in the affirmative.